Frank T. Cullitan, Co. Pros., Cleveland, Neil W. McGill, Asst. Co. Pros., Cleveland, for plaintiff-appellee.

Mooney, Hahn, Loeser, Keough & Freedheim, Cleveland, for defendant-appellant.

**STATE v CUMBERWORTH**

Ohio Appeals, 8th Dist.,
Cuyahoga Co.

No. 18699. Decided April 6, 1942.

**OPINION**

By SKEEL, J.

Defendant was adjudged guilty in the court of common pleas of the crime of sodomy. The case was tried to the court, the defendant having waived a trial by jury, in the manner provided by law.

The record presents one issue of fact and one question of law. First, whether or not there is sufficient evidence to sustain the defendant's contention by the proper degree of proof, that although the defendant had sufficient mind to distinguish between right and wrong, with respect to the criminal act which he admits he committed, yet due to disease of mind he did not have sufficient will power to resist the urge to commit such unlawful act. Second, is "irresistible impulse" due to disease of mind,

available as a defense in Ohio, where it is admitted that defendant had sufficient mental capacity to distinguish between right and wrong.

Upon the first of these two questions, the record fails to support the defendant's contention. The defendant called an eminent authority on mental diseases who testified in part that the defendant was suffering from what the witness called "pysopathic personality" which is evidenced by abnormal sex practices and other maladjustments. The doctor said his examination was conducted entirely by asking questions which developed the defendant's lack of power to inhibit himself in abnormal sex practices. In other words, the defendant lacked "will power." The doctor further testified as follows:

"Q. He does not have a psychosis now? Can you tell us, doctor, whether Stuart is suffering now and was suffering on or about August 15th of this year from a mental disease?

A. Yes, he was. I think his mental disease includes many different categories, and psychopathic personality is one of them.

Q. That is not an organic disease of the mind?

A. No, it is functional so far as anyone knows. In other words, there is no physical disease of the brain.

Q. Psychiatry, if it cannot find an organic disease of the brain, classifies the mental disease or mental disorder as functional?

A. That is right.

\* \* \* \* \* \*

Q. Now, it has been testified—has been charged in the opening statement by the prosecutor, and admitted by Stuart, that on August 15th of this year he committed the act known as fellatio with John Scullin; that from time to time over the course of the past few years he has committed the same act with Scullin and with other boys. Directing your attention to August 15th, or on or about August 15th, at the time the act took place, would you say, on the basis of your examination, that Stuart had the power to control his misdirected sex impulse?

A. I am doubtful if he had control. I asked him about that. Not about this specific August 15th occurrence, but about them in general. I asked him when this idea, this impulse had come up, would any other ideas come up? 'Well' he said, 'sometimes the idea would come up that it was not the right thing to do.' I asked him what—when the idea that it was not the right thing to do came up, what happened then? 'Well' he said, 'I went ahead and did that anyway.' I asked him why, and he says he didn't know, he just did it."

Q. Did he at that time know the nature of his act? That is, did he know it was wrong?

A. Yes, he knew that it was wrong.

Q. But he could not—he could not because of mental disease, prevent himself or inhibit himself from doing it?

A. That is right."

This testimony clearly substantiates the contention of the state that the defendant knew that his sodomous acts were wrong. Whether it tends to establish that because of disease or lack of mind he was able to control his unlawful acts or conduct is open to considerable doubt. The defendant does not say so; he was not called to the witness stand. The question put to him by the psychiatrist brought forth little or

no information of the character or strength of the urge. After he said he knew his conduct was wrong, and in response to a question put to him during his examination by his own doctor, * * * "When the idea that it was not the right thing to do came up, what happened?" (A) "Well" he said, "I went ahead and did that anyway." This evidence, together with the known facts of his abnormal conduct was the sole basis for the defendant's contention that he was driven to his misdeeds by an irresistible impulse. It may be that this would be sufficient to diagnose the defendant's case for clinical purposes, but certainly it would constitute a dangerous doctrine to hold that such testimony is sufficient to establish irresistible impulse when viewed from the standpoint of protecting the social order from the ravages of criminal conduct.

We conclude therefore that even if it were admitted that the defense of irresistible impulse compelling the doing of a known unlawful and wrongful act due to disease or lack of mind, constitutes a legal defense when properly proved, the court, in this case, was clearly justified in finding that such affirmative defense was not established by the preponderance of evidence.

We will now inquire into the state of the law with regard to the extent to which a plea of not guilty by reason of insanity may be a defense in a criminal case.

The leading case arose in England in 1843 and is known as McNaghten's case. The judges, in reply to a question put to them by the House of Lords, under what circumstances the law recognizes insanity as a defense in criminal actions, said:

"To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the party accused was laboring under such a defect of reason from disease of mind, as to not know the nature or quality of the act he was doing, or if he did know it, he did not know it was wrong."

This statement of the law as to the extent to which insanity may be pleaded as an affirmative defense in a criminal action, has been generally accepted by all courts and in many states has been adopted as the only test where insanity is pleaded as a defense in a criminal prosecution. Some jurisdictions, however, since the McNaghten case, have gone beyond the limits of the right and wrong test, holding that a person is not criminally responsible for an act, if done solely by reason of an irresistible impulse, although he may have known that his act was both morally and legally wrong. This extension of the right and wrong test is usually justified on the supposed ground that the actor is not a free agent because of the irresistible impulse due to lack or disease of mind and that therefore the defendant should not be subject to punishment for the doing of an act which he had not the power to resist even though he had sufficient mental capacity to know that what he was doing was wrong and in violation of law.

At the outset it must be understood that if we accept the doctrine of irresistible impulse as a defense, we must, as a consequence, agree that when properly established, it will constitute a complete exoneration from the power of the state to impose any punishment whatever. Whatever criticism there is that has been directed at the

law for failure to keep pace with the development of medical knowledge on the subject of mental diseases, has to do with the failure of the law, when imposing punishment, to make a distinction between the case of the defendant with sound mental capacity and one who is suffering from mental disease short of complete insanity.

Professor Waite, in an article upon this subject, published in 23 Mich. Law Rev. 9 (443) at pages 443-4, while commenting on the conflict between the legal and medical conception of the meaning of the word 'defense' said:

"They contend, (referring to the medical commentators) that insanity of any sort should be 'defense' but contextually it appears that they are perturbed not at all because the law holds abnormal persons liable but only because the law makes no differentiation in the consequences of their liability."

The purpose of criminal prosecutions is founded upon the need to protect society against the destructive conduct of the criminally minded. The imposition of penalties in criminal prosecutions is founded upon the theory of deterrence; deterrence both as to the defendant and also others whose social conduct may be influenced by knowledge thereby gained that penalties are in fact imposed for wrong doing. It is true, as has always been the theory of the criminal law, that except in cases where the leglislature has directed that the doing of certain specific acts shall constitute the actor guilty of a crime regardless of whether or not he acted with a guilty mind, before one can be found guilty of a crime, criminal intent must be shown and if one is incapable, because of disease of mind, of entertaining a criminal intent, he must be exonerated. But to extend the doctrine of immunity to cases where the actor knows that he is doing what is wrong but claims his inability to resist doing the act, even though such lack of resistance is claimed to be the result of disease of mind, is to project the judicial process into the realm of uncertainty and speculation.

If there should be a need to change the character or degree of punishment to be imposed on one guilty of crime, because of partial mental incapacity due to disease of mind including "irresistible impulse" or, if the long standing rule as to what degree of mental disability is sufficient to constitute a complete defense on the ground of insanity, such changes in the law should be the subject of legislation and not judicial decision.

That proof of irresistible impulse is subject to grave doubt is clearly brought out by Professor Waite on pages 454-455, in the article referred to supra:

"The possibly irresistible but abnormally compelling urge may justify a marked difference in treatment of an offender after conviction. The point here insisted upon, is that assuming deterrence to be the objective and the basis of liability, such a resistible urge can not logically exonerate from liability itself. On the contrary, it is the very type of case where the will to resist most needs strengthening and development through example. If there be criticism of the liability in such cases it must logically be criticism of the assumption that deterrence through observed punishment is possible, not of the conclusion, from that premise, that only truly and literally irresistible impulse is logically a defense against liability." * * *

"And even medicine seems a bit uncertain in the premise. So late as 1924, psychiatrists of established position and note can only say of morbid impulses,

"Under this head may be included a small group of morbid states that are characterized particularly by an irresistible impulse to perform some anti-social act. The impulse tends to recur periodically, usually in the same form for the same individual. These conditions are little understood and generally receive scant consideration in text books on psychiatry. In many respects they resemble the hysterical and psycopathic personalities, though they also present difficulties. Probably the best known examples are those classed as pyromania (impulsive incendiarism) and kleptomania (impulsive stealing). They are sufficiently rare to be justly considered psychiatric curiosities, though their striking results often make them into causes celebres. When offered as a defense for crime, the allegation of a morbid and irresistible impulse must always be regarded with suspicion and release from responsibility on such grounds under present circumstances, when no provision for proper segregation can be made, can rarely be justified.' "

In 70 A. L. R., page 660 and 661, the author sets out two cases that clearly state the majority rule. * *

"In People v Hubert, (1897) 119 Cal. 216, 63 Am. St. Rep. 72, 51 Pac. 329, Temple, J., speaking of the irresistible impulse doctrine said:

"We do not know that the impulse was irresistible, but only that it was not resisted. Whether irresistible or not, must depend upon the relative force of the impulse and the restraining force, and it has been well said, to grant immunity from punishment to one who retains sufficient intelligence to understand the consequences to him of a violation of the law may be to make an impulse irresistible which before was not....There are many degrees in mental unsoundness. Some cases can only be detected by a very skilled expert. Some cases of mental unsoundness might be known only to very intimate acquaintances and perhaps by them only noticeable under peculiar conditions. But, however slight the defect, only Omniscience can say whether the act would have been committed had the taint not existed. It is an impracticable rule. It is said the impulse is irresistible, because by the impairment of the emotional part of the intellect the will power is destroyed or weakened. No one contends that the legal test is perfect, doubtless it is far from being so, but when the will power is weakened although the mentality is not at all or only slightly impaired, the fear of punishment must be of some value as a restraint and the class of people referred to need that restraining influence most.

Lord Bramwell, in a discussion of this subject, related the case in which a witness, to prove that a prisoner was so afflicted, related that he had once become violent and killed a cat, and said he belived the impulse could not be resisted by the defendant. His Lordship asked if he thought he would have killed the cat if a policeman had been present. The witness answered, "no." His Lordship then said he supposed the impulse was irresistible only in the absence of a policeman."

"Likewise, the irresistible impulse doctrine was criticized as a legal criterion of criminal responsibility

in State v Harrison (1892) 36 W. Va. 729, 18 L. R. A. 224, 15 S. E. 982, 9 Am. Crim. Rep. 626, in the following terms:

'This 'irresistible impulse' test has been only recently presented, and while it is supported by plausible arguments yet it is rather refined, and introduces what seems to me a useless element of distinction for a test, and is misleading to juries, and fraught with great danger to human life, so much so that even its advocates have warningly said that it should be very cautiously applied, and only in the clearest cases. What is this 'irresistible impulse?' How shall we of the courts and juries know it? Does it exist when manifested in one single instance as in the present case? Or must it be shown to have been habitual, or at least to have evinced itself in more than a single instance, as Chief Justice Gibson said must be the case? We have kleptomania and pyromania. which better works on medical jurisprudence tell us cannot excuse crime where there is capacity to know the character of the act. . . . .Shall we introduce homicidal mania and allow him of the man-slaying propensity to walk innocent through the land while yet not insane, but capable of knowing the nature and wrong of his murderous act? For myself I cannot see how a person who rationally comprehends the nature and quality of an act and knows that it is wrong and criminal can act through irresistible innocent impulse. Knowing the nature of the act well enough to make him otherwise liable for it under the law, can we say that he acts from irresistible impulse and not criminal design and guilt? And, if we are sure he was seized and possessed and driven forward to the act wholly and absolutely by irresistible impulse, his mind being diseased, how can we say he rationally realized the nature of the act, realized it to an extent to enable us to hold him criminal in the act? How can the knowledge of the nature and wrongfulness of the act exist along with such impulse as shall exonerate him? Can the two co-exist? The one existing, does not the other non-exist?"

See also, 14 R. C. L. page 602, ¶56. Corpus Juris Secundum, Vol. 22, p. 121 ¶61. Ohio Jurisprudence, Vol. 12, p. 72, ¶27.

The judgment of the court of common pleas is therefore affirmed. Exceptions.

LIEGHLEY, PJ. & MORGAN, J., concur.