The State of Ohio, Appellee, *v.* Schaffer, Appellant.

(No. 974—Decided December 9, 1960.)

*Mr. Harold D. Spears,* prosecuting attorney, for appellee.
*Mr. J. B. Collier,* for appellant.

Doyle, J. The defendant in the Court of Common Pleas of Lawrence County, one Billy Joe Schaffer (appellant in this court), was indicted by the county grand jury on five separate counts: (1) murder in the first degree; (2) arson; (3) mutilation of a dead body; (4) maliciously entering a dwelling house and attempting to commit a felony; and (5) burning personal

property of a value greater than $25; contrary to and in violation of statutes making such offenses criminal.

The jury returned a verdict of guilty on all counts, and recommended mercy on the count of first degree murder.

It is strenuously argued on behalf of the appellant that there was not sufficient evidence to support a finding that the victim's death was the result of first degree murder. This court is asked, by the appellant, Schaffer, to reduce the judgment from first degree murder to manslaughter, and to completely eliminate the fourth count of the indictment, which pertains to the alleged wilful and malicious entering of the decedent's home, "contrary to Section 2907.13, Revised Code."

In the light of the various assignments of error, however, apparently we are also asked to review the question of error relating to the findings of guilt on the remaining three counts.

Billy Joe Schaffer, the accused, age 23, was reared in the city of Ironton, Ohio. He was the product of a broken and dissolute family. At the age of 15, or thereabouts, he was sent by court order to the Boys Industrial School for the crime of theft. Thereafter, at the age of 16, he joined the Army by falsifying his age. Later, upon his release from the Army, he engaged in various activities, one or several of which caused his confinement in a Colorado penitentiary, from which institution he later attained the status of a parole violator. In his wanderings through various states, he finally arrived, on February 20, 1958, in Ashland, Kentucky. On the next day, February 21, 1958, he crossed the Ohio River and proceeded to the home of his later victim, Mrs. Emma Remy, aged 75 years, the widow of a well-known Ironton doctor, who lived alone in the family homestead. Mrs. Remy was a former teacher in the public schools of Ironton, Ohio, and Billy Joe Schaffer had been one of her pupils.

From time to time, over a period of several years, the defendant had visited his former school teacher and had been the recipient of gifts of money and other favors. On the afternoon of February 21, 1958, Mrs. Remy answered his knock at her home, and they proceeded into the sitting room, where they engaged in conversation. He told her that he needed money for a certain purpose, and she replied by stating that he was not

telling the truth, for she knew that he had been in prison. She thereupon reprimanded him for his conduct and suggested that he change his ways. An argument ensued, and Mrs. Remy charged the defendant with striking her, whereupon she ran up the stairway to a bedroom on the second floor of her home, with the defendant in pursuit. Here, apparently, an assault and battery occurred, as evidenced by her blood on a bed located therein. The defendant thereupon forced his victim from the room, and attempted to take her downstairs. She temporarily escaped and ran to a window in her back bedroom, where she knocked and screamed in an attempt to secure help.

The state's brief states correctly the following facts, in connection with this event, in this language:

"At that time, two young ladies were walking past the house enroute home from high school. They were walking on the same side of the street as the house, and as they were about at the middle of the house and in the process of passing, they heard the noise at the upstairs window. At first they paid no particular attention, but the noise continued as they walked toward the corner and they turned around and walked back to discover what it was. One of the ladies saw a hand in the window, and a face, and heard a cry but could not identify the fact nor understand the cry. It was seen, however, in the lower pane of window glass, which, by reason of the nature of the window being a low-sill-type old-fashioned window would establish that the victim was near the floor if not on her hands and knees. The ladies, not understanding that there was trouble, continued along the street enroute home."

The defendant admitted that he pulled Mrs. Remy from the window, as well as from the bed, where a quantity of her blood was later discovered. He then forced her down the stairway, and, in the course of the struggle, he strangled her with his hands with such force and violence as to cause her death.

The force applied in perpetrating this homicide is, in part, evidenced by the testimony of the coroner in stating his observations of "hemorrhage and evidence of trauma to the neck area just behind the throat; two separate fractures of the hyoid bone (a small bone at the base of the tongue), indicating "extreme trauma to that area"; "hemorrhage into the espha-

gus behind the trachea in front of the vertebral bone,'' and evidence of ''external trauma or great pressure exerted on the trachea or windpipe.''

The defendant, after killing his victim, sought to dispose of the body. He took the corpse to a wooden stairway leading from a downstairs room to the cellar, and, after placing it on the steps about half way to the basement, he saturated inflammable material under the stairs with fluid from his cigarette lighter and set it on fire. Prior to the start of the arson, however, and after the killing, he had searched the house for money. After starting the fire he escaped by taxicab to Kentucky, and from there to a western state, where he was later captured.

Firemen, who responded to an alarm, found and removed the badly-burned body of Mrs. Remy before extinguishing the fire.

The above statement of facts is supported by the direct testimony of witnesses, the admissions of the defendant, and reasonable inferences to be drawn therefrom, although some statements made by the accused are in conflict.

In the 8th assignment of error, it is claimed that:

''* * * there is not one iota or scintilla of evidence pertaining to premeditation or deliberation of any kind whatsoever in the record, and the state failed to prove by evidence beyond a reasonable doubt the corpus delicti.''

Whatever difficulty there may be in analyzing facts to determine whether there be sufficient evidence of premeditation and deliberation, there is no difficulty in stating the law upon the subject.

In *State* v. *Ross*, 92 Ohio App., 29, at page 42, the law is declared as follows:

''It has been the law of this state for more than one hundred years that, if a person has actually formed the purpose to maliciously kill another, and deliberated and premeditated upon it before he performed the act of killing, he is guilty of murder in the first degree, however short the time may have been between the purpose and the execution. It is not the time of deliberation and premeditation that is requisite, but the actual existence of the purpose, malice, deliberation and premeditation, and it matters not how short the time, if the party has

actually turned it over in his mind, weighed and deliberated upon it. It makes no difference whether the deliberation was in forming the design maliciously to kill, or, in the continuance of such design after being formed, until the same was executed. * * *,,

In *State* v. *Maranda,* 94 Ohio St., 364, the court states:

"1. By the *corpus delicti* of a crime is meant the body or substance of the crime, included in which are usually two elements: 1. the act. 2. The criminal agency of the act.

"2. It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the *corpus delicti,* before such confession is admissible. The *quantum* or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a *prima facie* case. It is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged."

In the case before us, it is established beyond peradventure that Mrs. Remy met death through the violence of strangulation by human agency. No reasonable mind could reach any other conclusion following the examination of her broken and tortured body. The burns on her body occurred after death and were in no manner a contributing cause. No carbon monoxide was found in her blood, nor evidence of smoke or fire in her lungs. The evidence is as conclusive as any evidence can be that no respiration took place during the fire, and that death did not result from smoke or suffocation from fire or smoke.

The extrajudicial statements by the defendant placed upon him the crime of assault and battery on the neck of the victim, as well as the crime of arson. Not only were these statements and the physical facts before the jury, but also the testimony of a taxicab driver who received him as a paying passenger immediately in the rear of the victim's home at the time of the fire, and innocently drove him in his escape and flight to Ashland, Kentucky.

Certainly, here the requirements of the rule of corpus delicti were met, as there was compelling evidence that a human being came to her death by criminal means. The finding of the dead body of Mrs. Remy constitutes the corpus, and the

positive evidence of death resulting from strangulation by the hands of the defendant, coupled with evidence of other physical violence perpetrated by the defendant, constitutes the delictum, or felonious killing.

It should be stated, however, that proof of the defendant's connection with the crime as the operative agent, although essential for conviction, is not a part of the corpus delicti, nor is proof of the identity of the victim necessary to establish corpus delicti.

The evidence above stated was furthermore amply sufficient for a jury to find beyond a reasonable doubt that the human being was purposely killed by the defendant with malice, deliberation and premeditation.

Case law establishes the rule that the law presumes a man to intend results which are the natural, reasonable and probable consequences of his voluntary acts, and he is not presumed to intend results which are not the natural, reasonable or probable consequences of such act. *State* v. *Farmer*, 156 Ohio St., 214. 15 Ohio Jurisprudence (2d), Criminal Law, Section 311, and cases cited therein.

Cases are legion which apply this rule to shooting with firearms, stabbing with a knife or other sharp instrument, and the administering of poison.

In the instant case we are concerned with the application of the rule to a case where criminal homicide was occasioned without the use of a deadly weapon, as that term is used in the ordinary sense. Here we are concerned with the use of a man's arms and hands. In such a case, a jury is not precluded from finding that malice and an intent to kill existed, when it appears that a young man in his early twenties ferociously attacked an elderly woman in her middle seventies and strangled her to death with his hands by using force of sufficient intensity to break the hyoid bone in two places, and to lacerate and mangle the throat and areas near thereto, culminating in hemorrhage of large volume.

Under the rule that the law presumes a man to intend results which are the natural, reasonable and probable consequences of his voluntary acts, an intent to kill with deliberation and premeditation may be found to exist where a young man

of strength and vigor uses his hands and muscles to violently strangle an elderly, helpless woman. Under such circumstances, the hands may be found to be the equivalent of a deadly weapon, and to constitute instruments likely to produce death when viciously employed to strangle.

This homicide (as indeed are most murders) was accomplished without the presence of witnesses. It was the province of the jury to draw reasonable inferences from the physical facts and the extrajudicial statements of the defendant; it was likewise the right of the jury to draw the inference or presumption of fact that the defendant intended to kill Mrs. Remy, which result, in the normal course of events, would be the natural, reasonable and probable consequences of his vicious and unmerciful battery upon the body of the elderly person.

It was further within the province of this jury, from the evidence adduced, to find that deliberation and premeditation of an intent to kill arose during the course of the brutal affair which culminated in violent death. As stated heretofore, "it makes no difference whether the deliberation [and premeditation] was in forming the design maliciously to kill, or, in the continuance of such design after being formed, until the same was executed," nor "it matters not how short the time, if the party has actually turned it over in his mind, weighed and deliberated upon it."

It is the conclusion of the court that the evidence is sufficient to establish, beyond a reasonable doubt, that the defendant "unlawfully, purposely, and of deliberate and premeditated malice," killed Emma Remy.

It is further argued by the appellant that "defendant was mentally sick and a psychopath. In other words, this defendant did not have the mental ability to cooly and deliberately premeditate or plan murder. He was a creature who acted on the spur of the moment and did not have the moral brakes or capability of controlling his actions."

In the record of testimony appears the observations of a noted psychiatrist and neurologist. He stated that the defendant was "suffering from a psychopathic personality disturbance and is now a sociopsychopath of a very severe and chronic nature." However, in answer to the following ques-

tion: "* * * did Billie Joe Schaffer, on the 21st day of February, 1958, have such mental power and emotional soundness so as to be able to know that if he did a wrong act he would be liable to punishment?"—the witness said: "Yes, he was able to know the consequences of his acts."

In considering the defense of insanity, the jury was justified in reasoning to the conclusion that the defense did not show that the defendant, at the time of the strangulation, was laboring under such a defect of reason from disease of mind as not to know the nature or quality of the act he was doing, or, if he did know it, he did not know it was wrong. Furthermore, the jury was justified in rejecting as a defense the so-called rule of "irresistible impulse," for the reason that, even if evidence might show an "irresistible impulse" to kill, in an individual who knows the difference between right and wrong, and who kills with such knowledge, such person is not relieved from criminal responsibility. *State* v. *Ross, supra*. *State* v. *Cumberworth*, 69 Ohio App., 239. 173 A. L. R., 391, annotation.

We find the claim untenable that the defendant could not be guilty of murder because of insanity.

Upon careful examination of all the charges of error in their relation to the homicide, we find none to reach the status of prejudicial. The judgment of murder in the first degree will not be reduced to manslaughter, as requested, but will be affirmed as rendered in the trial court.

As heretofore indicated, the sole purpose of this appeal, as stated by the defendant, is "to obtain a modification of the judgment of the trial court in the following respects—i. e., to reduce the judgment from first degree murder to manslaughter and to completely eliminate the fourth count of the indictment which pertains to the alleged wilful and malicious entering of decedent's home."

We have disposed of the first request and now direct attention to the second one.

Section 2907.13, Revised Code, upon which the fourth count in the indictment is predicated, reads:

"No person shall, by day or night, maliciously enter a dwelling house * * * and attempt to commit a felony."

The defense asserts there is no evidence that the defendant

"intended to commit any crime whatsoever when he entered the home of Emma Remy," and that therefore he did not "maliciously enter."

As we view this statute, it is violated when one first "maliciously enters a dwelling house," and, secondly, attempts to or commits a felony. "In common parlance malice is associated with anger, hatred, or revenge, but malice in contemplation of law may exist without the presence of any of these passions. Malice in law is defined as a wilfully-formed design to do another an unlawful injury, whether such design is prompted by deliberate hatred or revenge, or by the hope of gain, or springs from the wantonness and depravity of a heart regardless of social duty and fatally bent on mischief." 15 Ohio Jurisprudence (2d), Criminal Law, Section 31, and cases cited.

Malice characterizes acts done with an evil disposition—a wrong and unlawful motive or purpose. The word is variously used according to the nature of the litigation, but in criminal litigation it has the meaning stated above.

In the present case it was not necessary for the jury to find that the defendant had any ill will toward the deceased or any special design against her life when he entered her home. In the light of the facts subsequently established, however, it was reasonable for the jury to infer and conclude that he entered her home with the design and purpose of receiving financial help, and that he intended to use whatever means necessary, either lawful or unlawful, to accomplish his mission. This inference, properly drawn from the facts, was sufficient to establish a malicious entry.

The second requisite for conviction under this statute is the commission of a felony, or the attempt to do so. The murdered and burned body of the hostess satisfies this requisite of the statute.

Every act of the defendant, from the time of his entrance into the home until his escape in flight, was a part of the *res gestae*.

The claim of error in this part of the judgment we also find untenable.

This case depicts a shocking crime; and, in our study of the record, we are of the opinion that the many safeguards

thrown about an accused person by the law have been observed. The court ably and fairly accorded the accused a fair trial. We are satisfied beyond reasonable doubt, as was the jury, that the evidence, coupled with all reasonable inferences to be drawn therefrom, shows the appellant, Schaffer, guilty of the charges contained in each and every count in the indictment.

. We specifically find no error in the record of a prejudicial character (see Section 2945.83, Revised Code), and with this finding we affirm the conviction on all counts.

*Judgment affirmed.*

GILLEN, P. J., and RADCLIFF, J., concur.

DOYLE, J., of the Ninth Appellate District, sitting by designation in the Fourth Appellate District.