OPINION
{¶ 1} Defendant-appellant, William A. Foster, is appealing from his conviction on charges of aggravated murder and having a weapon while under disability. He assigns two errors for our consideration:
 [I.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE VERDICT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT THE VERDICT. *Page 2 
 [II] TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN NOT REQUESTING THAT THE COURT GIVE THE JURY A VOLUNTARY MANSLAUGHTER INSTRUCTION AND IN NOT FULLY DEVELOPING EVIDENCE TO SUPPORT THAT CHARGE AS WELL AS THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE, RESULTING IN THE DENIAL OF THE RIGHT TO A FAIR TRIAL AND THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION.
 {¶ 2} In the first assignment of error, appellant attacks the sufficiency of the evidence against him and argues that the guilty verdicts were against the manifest weight of the evidence.
 {¶ 3} The standard of review for sufficiency of the evidence is if, while viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 4} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. Id. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, paragraph two of the syllabus, following Jackson v. Virginia (1979), *Page 3 443 U.S. 307, 99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. SeeThompkins, at 387.
 {¶ 5} In Jenks, the Supreme Court of Ohio set forth the role of an appellate court in reviewing a challenge to the sufficiency of the evidence:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Id. at paragraph two of the syllabus.
 {¶ 6} In evaluating the weight and the sufficiency of the evidence, we must review all the evidence presented at trial. The defense presented no witnesses and no exhibits, so we limit ourselves to a review of the State's evidence.
 {¶ 7} A total of 12 witnesses were called to testify on behalf of the State of Ohio. The first witness was Andrew Drake, a patrol officer with the Columbus Division of Police in the 11th Precinct. On July 29, 2006, he was dispatched on a report that a shooting had occurred at or near 664 Rhoads Avenue on the southside of Columbus, Ohio. He found a person lying on the sidewalk shot and apparently deceased. He and other officers secured the scene until the Crime Scene Search Unit ("CSSU") of the Columbus Division of Police arrived. Officer Drake identified several photographs taken of the area and the man who had been shot. He also identified a shell casing found in the area and *Page 4 
described the differences between revolvers and semi-automatic weapons. He further testified that he helped canvas the neighborhood to look for witnesses to the shooting.
 {¶ 8} On cross-examination, Officer Drake indicated that 664 Rhoads Avenue was known in the neighborhood for drug and prostitution involvement.
 {¶ 9} The second witness was Randolph Garner, a former resident of 664 Rhoads Avenue. Garner identified several people he knew from the neighborhood, including Raymond Campbell who was known on the streets as "Thunder." Thunder was the man shot and killed on July 29, 2006.
 {¶ 10} Garner described that day as typical. People came over and got high, drank and/or spent time "with the girls." Garner described the neighborhood and the interior of 664 Rhoads Avenue, and identified pictures taken of both.
 {¶ 11} On the night of the shooting, both Garner and Thunder slept on the floor downstairs. William Foster, who Garner knew as "P" or "Pete," woke Garner up. Soon Thunder woke up and became upset because he felt some money he had was now missing. Thunder felt that the money had been stolen from him. Pete felt he was being accused and took offense. Pete got angry, gave a warning and fired a shot into the floor. After that, Garner wanted Pete to "move on" or leave. Pete then started to leave.
 {¶ 12} Garner viewed the argument as over as Pete walked down the stairs of 664 Rhoads Avenue. Thunder got up and ran out of the door after Pete. Garner then heard a shot and realized Thunder had been shot. Pete left. Garner also left to call 9-1-1. The police and emergency personnel soon arrived.
 {¶ 13} On cross-examination, Garner acknowledged that he had been drinking beer and using crack cocaine the evening before the shooting. Garner described in detail *Page 5 
his use of beer and crack. He indicated that he had been described as an addict because he felt normal when using drugs and alcohol and abnormal when not. He also acknowledged being sent to prison as the result of a robbery conviction.
 {¶ 14} The next witness was William A. Cox, M.D., a forensic pathologist with the Franklin County Coroner's office. Dr. Cox did the autopsy on Raymond Campbell, also known as "Thunder." Raymond Campbell died as the result of a perforating gunshot wound which involved perforation of the left lobe of the heart and the aorta. The wound was not a contact wound. No alcohol or cocaine was in Raymond's blood, but cocaine metabolites were found in the blood. Cocaine and its metabolites were found in Raymond's urine. Cocaine metabolizes quickly, the doctor testified, so Raymond had been using cocaine shortly before he died, probably within two or three hours.
 {¶ 15} On cross-examination, Dr. Cox testified about the effect of cocaine on the human body. He indicated that a chronic user of cocaine may become very irritable and may have a tendency toward violence while coming off a cocaine high.
 {¶ 16} The fourth witness was Charles Mallory Pettiford, known on the streets as "Mallory." Mallory was at 664 Rhoads Avenue on the date of the shooting. He knew William Foster as "Pete." Mallory spent the night of July 28, 2006 in an upstairs bedroom where he used some cocaine and spent some time with a woman.
 {¶ 17} The next morning, he heard a heated discussion downstairs involving someone he thought was named "Toledo," but could have been called "Thunder" and someone Mallory thought was Pete. Then Mallory heard at least one gunshot. Mallory soon went downstairs and saw a body on the sidewalk. Mallory tried to get someone to call 9-1-1. Soon after that, he left. *Page 6 
 {¶ 18} The fifth witness at trial was Thomas Burton, a detective with the Columbus Division of Police assigned to the CSSU. He described the processing of the scene of the shooting and the work he did there. He found a spent shell casing on the front step of 664 Rhoads Avenue and a second spent shell casing in the living room of that address. He also processed the scene for fingerprints of value and fingerprints from Pete/William Foster were found on a 24 ounce Miller beer can.
 {¶ 19} The sixth witness was Lawrence Bisutti, who also is assigned to CSSU. He performed a gunshot residue test on Randolph Garner. Subsequent lab analysis of the testing indicated that Garner had not fired a firearm recently.
 {¶ 20} Mark Green, the seventh witness, also is assigned to CSSU. He works at the Franklin County Morgue. Detective Green collected a projectile from the body and turned it over to the Columbus Police Property room.
 {¶ 21} The eighth witness was Sonya Frazier, who is also known as "Lisa" on the streets. She used to live about a block and one-half from 664 Rhoads Avenue. She knew Garner, Mallory, Thunder and Pete.
 {¶ 22} Ms. Frazier described 664 Rhoads Avenue as a "crack house" where a person could do drugs and/or have sex with prostitutes. She described Pete/William Foster as someone who was in and out of 664 Rhoads Avenue and someone who supplied "dope." She used crack cocaine the evening before the shooting and later went to her home to sleep.
 {¶ 23} The next morning Ms. Frazier's brother brought her some money so she returned to 664 Rhoads Avenue to try to buy drugs. Pete pulled up in a green car and went inside while Ms. Frazier was still outside. Pete then came out of the house and *Page 7 
Thunder came to the inside of the door. The two seemed to be having a verbal disagreement.
 {¶ 24} Pete said "what did you say? I don't like your fagot ass no way." (Tr. 344.) Pete then pulled a gun and fired a shot. She thought this was followed by a second shot. One shot hit Thunder. Pete then left. Ms. Frazier asked some nearby people to call 911. Her recollection of the location of a second shot by Pete/William Foster is not consistent with the physical evidence of where the shell casings were found.
 {¶ 25} Ms. Frazier described Pete as intimidated by Thunder because Thunder was a big, muscular man. Ms. Frazier initially refused to provide any information to the police because she did not want to be considered a "snitch." She eventually did talk to the assistant prosecuting attorney trying the case but expected no reward for her testimony because she faced a low-level felony. She said she was testifying because someone was killed.
 {¶ 26} The next witness at trial was James Estep. He was at his aunt's place on Rhoads Avenue when he heard two gunshots. Then a man came walking up to a green Buick parked nearby and drove away.
 {¶ 27} The tenth witness was Michael Bruce, a patrol officer with the CPD. Officer Bruce tried to pull over a vehicle being driven by William Foster and after a brief chase, caught and subdued Foster. He felt Foster had been using crack cocaine. Foster claimed knowledge of a shooting in which the shooter had to do what he did even though the person shot had no gun. The shooter thought the man shot was going to kill the shooter. Officer Bruce provided this information to Detective John Weis, the managing detective on the 664 Rhoads Avenue shooting. *Page 8 
 {¶ 28} The eleventh witness was Detective John Weis. As a detective for the CPD, he was the person managing the investigation of the shooting at 664 Rhoads Avenue. He described the scene of the shooting in detail and the responsibilities of the police officer involved. Part way through Detective Weis' testimony, the parties stipulated the testimony of Mark Hardy, the police firearm examiner. Mr. Hardy found that the two shell casings recovered at 664 Rhoads Avenue were fired from the same weapon. The projectile recovered from the body could have been part of a bullet for which one of the shell casings was the shell casing.
 {¶ 29} Detective Weis developed a photo array which included Pete/William Foster. Mallory identified a photo of Pete from the array. As a result of Officer Bruce's contact with Foster, Detective Weis went to interview Foster at the facility where Foster was in custody. Foster denied knowledge of the shooting at 664 Rhoads Avenue or of the address but claimed knowledge of a different, nearby shooting. Foster did claim knowledge of some big "dope group" who frequented 664 Rhoads Avenue.
 {¶ 30} When interviewed a second time, Foster initially claimed he had been in Marion, Ohio when the shooting occurred. When informed his fingerprint was on a beer can from 664 Rhoads Avenue, Foster acknowledged his presence but said he lied earlier because he did not want his wife to know he used crack cocaine. Foster continued denying knowledge of the shooting.
 {¶ 31} The final witness was Keith Jones, a person with a lengthy criminal record and a lengthy history of testifying for the prosecution. Jones denied ever receiving any benefits from the numerous times he has been a witness for the prosecution. He acknowledged being released from jail on a recognizance bond on occasion. Jones *Page 9 
claimed to have talked to William Foster while the two were in custody. Foster said "he killed the guy" and that the owner of the crack house where the shooting occurred had caught a case and would not come to court. Jones identified Foster as the man with whom he talked.
 {¶ 32} William Foster was charged with having a weapon under a disability, in violation of R.C. 2923.13 and with aggravated murder, in violation of R.C. 2903.01. The aggravated murder charge carried a three-year firearm specification on the theory he used a firearm in the commission of the offense.
 {¶ 33} R.C. 2923.13 reads:
 (A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 (1) The person is a fugitive from justice.
 (2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
 (3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.
 (4) The person is drug dependent, in danger of drug dependence, or a chronic alcoholic.
 (5) The person is under adjudication of mental incompetence, has been adjudicated as a mental defective, has been committed to a mental institution, has been found by a court *Page 10 
to be a mentally ill person subject to hospitalization by court order, or is an involuntary patient other than one who is a patient only for purposes of observation. As used in this division, "mentally ill person subject to hospitalization by court order" and "patient" have the same meanings as in section 5122.01 of the Revised Code.
 (B) Whoever violates this section is guilty of having weapons while under disability, a felony of the third degree.
 {¶ 34} Clearly the evidence supports the trial court's guilty verdict for having a weapon under disability. Foster apparently carried a firearm regularly and drew the weapon to shoot Thunder. The first assignment of error is overruled with respect to the weapon under disability charge.
 {¶ 35} Aggravated murder is defined by R.C. 2903.01(A) as follows:
 No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
Purposely causing the death of another with prior calculation and design was the only theory pursued, so the remaining portions of R.C. 2903.01
are not pertinent to this case.
 {¶ 36} When the Ohio legislation modernized Ohio's criminal code in 1974, the legislature included the following Committee Comment:
 The first part of this section restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. See, State v. Schaffer, 113 OApp. 125, 17 O.O. 2d 114, 177 N.E.2d 534 (Lawrence Co. App. 1960). The section employs the phrase, "prior calculation and design," to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the *Page 11 
crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation.
 {¶ 37} The jury was charged on both murder and aggravated murder charges, with prior calculation and design being the only distinguishing element.
 {¶ 38} The State of Ohio argued that the prior calculation and design occurred between the first and second shots. The argument in the record reads:
 He fired two shots: There was a delay between the first shot and the second shot. One shot happened inside; one shot happened outside. He had time to think about it. He had time to change his mind. He had time to decide not to do it in fact. He may have even made that decision at some point that he was going to leave.
 But he turned around, and he chose to pull the trigger. And this time he shot through the heart when he hit, and he killed him. He had time to think. He had time to realize he had a gun. He had time to conceptualize what he was doing, what he was considering doing. That's called prior calculation and design.
(Tr. 487.)
 {¶ 39} The testimony from Randolph Garner, who was the only person who saw the first shot, was that Foster fired a shot into the floor. That shot clearly was not homicidal. That shot was not intended to harm anyone. The shot can only be viewed as a warning.
 {¶ 40} Foster then left the 664 Rhoads Avenue address and was outside when Thunder pursued him. Foster then pointed the gun at Thunder and shot.
 {¶ 41} The guilty verdict as to aggravated murder does not correspond with the charges given to the jury on "prior calculation and design." That charge was:
 A person acts with prior calculation and design when, by engaging in a distinct process of reasoning, he forms a *Page 12 
purpose to kill and plans the method he intends to use to cause death. The circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause death is not sufficient.
(Tr. 532.)
 {¶ 42} The evidence was not sufficient to sustain a verdict of aggravated murder based upon prior calculation and design. The first assignment of error is sustained as to that verdict.
 {¶ 43} The evidence did support a guilty verdict of murder, namely purposely causing the death of another. Foster pointed a gun at Thunder's heart and shot. A purpose to kill was quite capable of being inferred from that act.
 {¶ 44} The first assignment of error is overruled as to the lesser included offense of murder.
 {¶ 45} In the second assignment of error, appellate counsel argues that trial counsel rendered ineffective assistance of counsel for purpose of the Sixth Amendment to the United States Constitution. Appellate counsel contends two specific areas of trial counsel's performance. First, trial counsel did not develop evidence to support a theory of voluntary manslaughter as the trial's outcome. Second, trial counsel did not fully develop self-defense as a theory.
 {¶ 46} Self-defense simply did not apply. William Foster was outside 664 Rhoads Avenue when he turned and shot Thunder in the heart. There is no evidence to support a theory that Foster felt he was in imminent danger of serious physical harm or death when *Page 13 
he turned and shot. Nothing in the record would have supported a charge to the jury on self-defense. Trial counsel's failure to pursue this as a defense certainly could not be considered a lapse in professional judgment for purposes of the Sixth Amendment to the United States Constitution.
 {¶ 47} Voluntary manslaughter is defined in R.C. 2903.03 as follows:
 (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person in to using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
 (B) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree.
 {¶ 48} Some evidence is in the record that Foster was under the influence of sudden passion or a sudden fit of rage. However, the record is devoid of evidence that the rage was brought on by a serious provocation reasonably sufficient to incite Foster into using deadly force. Accusing Pete/Foster of stealing a dollar or two does not qualify as such a provocation. Thunder's running out of the door toward Pete/William Foster after he had left 664 Rhoads Avenue does not qualify as such a provocation. A defense aimed toward voluntary manslaughter would have had only a little more credibility than a self-defense theory.
 {¶ 49} The leading case on ineffective assistance of counsel isStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. UnderStrickland, trial counsel's assistance must be so defective as to deprive the criminal defendant of a fair trial. Foster clearly shot and killed a man under circumstances where self-defense did not apply and voluntary manslaughter did not fit the facts. Foster was always going to be found guilty of *Page 14 
aggravated murder or murder with a firearm specification and of having a weapon under disability. Counsel's pursuit of an all or nothing defense was not ineffective assistance of counsel under the circumstances.
 {¶ 50} The second assignment of error is overruled.
 {¶ 51} We sustain the first assignment of error with respect to the prior calculation and design element of aggravated murder, but not with respect to the lesser included offense of murder. We overrule the first assignment of error with respect to murder with a three-year firearm specification and with respect to the having a weapon under disability charge. We overrule the second assignment of error. We vacate the judgment with respect to the aggravated murder charge and remand the case for re-sentencing on the offense of murder with a firearm specification and having a weapon under disability.
Judgment affirmed in part, reversed in part, and remanded forresentencing.
 PETREE and McGRATH, JJ., concur. *Page 1