[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 133.]

THE STATE OF OHIO, APPELLEE, *v.* KEENAN, APPELLANT.

[Cite as *State v. Keenan*, 1998-Ohio-459.]

*Criminal law—Aggravated murder—Death penalty—Original conviction reversed and remanded for further proceedings due to misconduct of prosecutor throughout much of trial and during closing argument—Imposition of death penalty after remand upheld, when.*

(No. 96-2311—Submitted October 7, 1997—Decided February 25, 1998.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 67452.

_____

{¶ 1} Appellant, Thomas Michael "Mike" Keenan, was convicted of the aggravated murder of Anthony Klann and sentenced to death.

{¶ 2} Keenan employed Anthony Klann, Edward Espinoza, and Joseph D'Ambrosio in his landscaping business. On either Thursday, September 22, or Friday, September 23, 1988, at about 7:00 p.m., Klann went to "The Saloon," a Cleveland bar, with Paul "Stoney" Lewis, his roommate and friend (and a former employee of Keenan's). Keenan, Espinoza, and D'Ambrosio went to The Saloon after work that same evening.

{¶ 3} Keenan and Lewis encountered each other at The Saloon and subsequently left the bar together. They took Keenan's truck to another bar known as Coconut Joe's, which was located in Cleveland Heights. Before going inside, Keenan gave Lewis some cocaine and marijuana, in lieu of seventy dollars Keenan owed Lewis. Later, Klann entered Coconut Joe's. Espinoza and D'Ambrosio arrived sometime after Klann.

{¶ 4} According to Lewis, Espinoza had a dispute with Klann at Coconut Joe's and shouted at him several times. One time, Lewis followed them into the men's room; he found Espinoza "hollering" and shaking his finger in Klann's face.

(Espinoza admitted that he and Klann went into the men's room together, but denied having a "disagreement" with Klann.)

{¶ 5} Lewis left Coconut Joe's around midnight. Later, Espinoza was ejected from the bar. Keenan, Espinoza, and D'Ambrosio left Coconut Joe's together at approximately 1:30 or 2:00 a.m. Keenan drove away, while Espinoza and D'Ambrosio walked from the bar to D'Ambrosio's apartment.

{¶ 6} Before Espinoza and D'Ambrosio went inside the apartment, Keenan drove up in his truck. Keenan accused Lewis of stealing "dope" from his truck and asked Espinoza and D'Ambrosio to help look for Lewis. They agreed. In D'Ambrosio's apartment, Espinoza armed himself with a baseball bat, while D'Ambrosio grabbed a knife. About 2:00 or 2:30 a.m., they joined Keenan in the truck and the three of them cruised the so-called "Little Italy" area of Cleveland, looking for Lewis.

{¶ 7} James Russell, an acquaintance of Keenan's, lived with Carolyn Rosell in an apartment in Little Italy. About 3:00 a.m., Russell and Rosell were awakened by someone banging on their door. They let Keenan, D'Ambrosio, and Espinoza into their apartment. Keenan asked where Lewis was and threatened to kill Lewis. Keenan told Russell that Lewis "had ripped him off." After about fifteen minutes, Keenan and his men left.

{¶ 8} Keenan, still searching for Lewis, drove up Mayfield Hill, where he saw Klann walking in the opposite direction. According to Espinoza, there was a "light rain, drizzle" falling "off and on." Keenan pulled over and hailed Klann. When Klann approached, Keenan grabbed him and forced him into the truck.

{¶ 9} Keenan, Espinoza, and D'Ambrosio repeatedly asked Klann where Lewis was, threatening "to hurt him" if he did not tell. Klann insisted that he did not know. During this interrogation, Espinoza struck Klann in the head with the baseball bat. Klann did tell the group where he and Lewis lived. Keenan drove there, and he and Espinoza knocked on what Keenan thought was Lewis's door.

{¶ 10} Memsel Dendak and Adam Flanik lived together in the same apartment complex as Lewis and Klann. About 3:00 a.m., they were awakened by "shouting and screaming" outside. Dendak heard someone yell, "I want my dope" (or "my coke"). Flanik went out to investigate and found Espinoza pounding on someone's door. Espinoza asked Flanik where "Stoney" (Lewis) lived. Espinoza then went to Lewis's door and pounded on it, saying, "Where is Stoney? I'm going to kill him."

{¶ 11} Keenan got out of the truck and also began to pound on Lewis's door. Flanik later described Keenan's behavior as "very violent." Keenan informed Flanik that he was looking for Lewis because Lewis had stolen something.

{¶ 12} Klann stayed in the truck. Flanik looked over and saw D'Ambrosio, who was sitting behind Klann, holding a knife to Klann's neck. Flanik thought Klann "looked intimidated by Joe, because he wasn't turning his head to see who was behind him * * *." Klann also looked to Flanik as though he had been "roughed up."

{¶ 13} Finally, Espinoza gave up pounding on the door and proceeded to kick it until it came open. He and Keenan entered Lewis's apartment, looked around briefly, then got back in the truck and left.

{¶ 14} Keenan drove back to Russell's residence. Espinoza went to the door and asked Russell if Lewis had been there. He told Russell to tell Lewis that Espinoza "had a contract out on him." He then returned to the truck.

{¶ 15} Keenan then drove to Doan's Creek, where he pulled the truck over. Holding D'Ambrosio's knife, Keenan ordered Klann out of the truck. As they stood at the edge of the creek, Keenan asked Klann for the last time where Lewis was. Klann still did not know. Keenan ordered Klann to tilt his head back. Keenan then slashed Klann's throat, led him to the creek, and pushed him in. Klann got up and was "stumbling" around. Keenan said to D'Ambrosio, "Finish him." D'Ambrosio

took the knife and jumped into the creek. Espinoza heard splashing and heard Klann yell, "[P]lease don't kill me."

{¶ 16} On Saturday, September 24, a jogger found Klann's body in Doan's Creek. The next day, Dr. Elizabeth Balraj, the county coroner, performed an autopsy on the body. She found that Klann's throat had been slashed, his windpipe perforated. Klann had also been stabbed three times in the chest. Balraj was unable to estimate a time of death.

{¶ 17} Keenan was indicted on four counts. Count One charged aggravated murder under R.C. 2903.01(A) (prior calculation and design); Count Two, aggravated murder, R.C. 2903.01(B) (felony-murder); Count Three, kidnapping; and Count Four, aggravated burglary (breaking into Lewis's apartment). Each aggravated murder count carried a felony-murder kidnapping specification, R.C. 2929.04(A)(7).

{¶ 18} Keenan was convicted of all counts and specifications, and the common pleas court sentenced him to death on both aggravated murder counts. In *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203, this court reversed Keenan's convictions for prosecutorial misconduct and remanded the case to the common pleas court for further proceedings. On remand, Keenan was retried on the original indictment, convicted again of all counts and specifications, and sentenced again to death. The court of appeals affirmed. The cause is now before us upon an appeal as of right.

———————————

*Paul Mancino, Jr.*, for appellant.

———————————

**LUNDBERG STRATTON, J.**

{¶ 19} We have reviewed Keenan's propositions of law, independently weighed the evidence relating to the death sentence, balanced the aggravating circumstance against the mitigating factors, and compared the sentence to those

imposed in similar cases. As a result, we affirm the convictions and sentence of death.

## I. CHOICE OF COUNSEL

{¶ 20} In his first proposition of law, Keenan contends that he was denied his constitutional right to counsel of his choice when the trial judge replaced his retained counsel, Paul Mancino, Jr. and John H. Higgins, with court-appointed counsel on conflict-of-interest grounds.

{¶ 21} Higgins had previously represented Keenan's co-defendant, Joseph D'Ambrosio, at his trial for Klann's aggravated murder. D'Ambrosio was convicted, and Mancino represented him on appeal to the court of appeals. Higgins then represented D'Ambrosio on appeal to this court. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 616 N.E.2d 909; *State ex rel. Keenan v. Calabrese* (1994), 69 Ohio St.3d 176, 631 N.E.2d 119. The trial court found that Mancino's and Higgins's prior representation of D'Ambrosio created an actual conflict of interest that precluded them from representing Keenan under DR 5-105.[1]

{¶ 22} Whether or not an *actual* conflict of interest existed, there clearly was a *potential* conflict of interest inherent in Keenan's representation by the same attorneys who had represented D'Ambrosio in litigation stemming from the same set of facts. "[A] possible conflict inheres in almost every instance of multiple representation." *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 346.

{¶ 23} In *State v. Gillard* (1992), 64 Ohio St.3d 304, 595 N.E.2d 878, the same attorney represented two co-defendants at a preliminary hearing, then represented one of them in the trial, even though the other one testified on behalf of the defense. On those facts, we held that "there is a clear possibility of conflict

---

1. Keenan petitioned the court of appeals for writs of mandamus and prohibition to compel vacatur of the trial court's disqualification order; the writs were denied, and we affirmed that denial in *State ex rel. Keenan v. Calabrese* (1994), 69 Ohio St.3d 176, 631 N.E.2d 119.

of interest" and that the trial court, on being apprised of these facts, knew or should have known "that a possible conflict of interest existed which could affect [defense counsel's] representation of appellant." *Id.* at 312, 595 N.E.2d at 883. See, generally, *State v. Dillman* (1990), 70 Ohio App.3d 616, 621-623, 591 N.E.2d 849, 852-853.

{¶ 24} The existence of a potential conflict is fatal to Keenan's claim. A trial court "must be allowed substantial latitude in refusing waivers of conflicts of interest not only * * * where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict * * * ." *Wheat v. United States* (1988), 486 U.S. 153, 163, 108 S.Ct. 1692, 1699, 100 L.Ed.2d 140, 151. Thus, "the standard of review for determining whether the court erred in its pretrial disqualification of defense counsel is whether it abused its broad discretion." *State ex rel. Keenan v. Calabrese*, 69 Ohio St.3d at 180, 631 N.E.2d at 122.

{¶ 25} Keenan claims that a criminal defendant has an "unqualified" constitutional right to retain counsel of one's choice. There is no such right. A defendant has only a *presumptive* right to employ his own chosen counsel. "[T]hat presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

{¶ 26} The trial judge has "wide latitude" in determining that an actual or potential conflict exists. *United States v. Mays* (C.A.6, 1995), 69 F.3d 116, 121. Moreover, it is irrelevant that both Keenan and D'Ambrosio waived their right to conflict-free counsel. *Wheat* makes clear that the trial court may "refus[e] waivers of conflicts of interests * * *." 486 U.S. at 163, 108 S.Ct. at 1699, 100 L.Ed.2d at 151.

{¶ 27} "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or

unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. There is nothing in this record that could justify us in finding that the trial judge abused his discretion by disqualifying Mancino and Higgins. Therefore, we must overrule Keenan's first proposition of law.

## II.    SELF-REPRESENTATION

{¶ 28} Although represented by (appointed) counsel, Keenan filed a *pro se* motion asking the court to let him act as "co-counsel." The trial court granted this motion in part and denied it in part, permitting Keenan to examine witnesses, but not to argue to the jury. In his second proposition of law, Keenan claims that the trial court deprived him of his constitutional right to self-representation by denying him leave to argue to the jury.

{¶ 29} A criminal defendant does have a constitutional right to represent himself. *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. Moreover, when the defendant conducts his own defense, his right of self-representation includes the right to personally argue to the jury. *Herring v. New York* (1975), 422 U.S. 853, 864, 95 S.Ct. 2550, 2556, 45 L.Ed.2d 593, 602, fn. 18; *McKaskle v. Wiggins* (1984), 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122, 131.

{¶ 30} However, Keenan never asked to be allowed to argue to the jury. Indeed, he affirmatively stated to the trial judge that he was *not* asking permission to argue to the jury. Keenan's statement clearly constitutes a waiver.

{¶ 31} Nor did Keenan invoke his right to self-representation. His motion specifically asked leave to participate as "co-counsel" and did not request the discharge of his appointed counsel.[2] A defendant has no right to a "hybrid" form of representation wherein he is represented by counsel, but also acts simultaneously

---

2. In a separate motion filed the same day, Keenan did ask the trial court to discharge his appointed counsel, but that request was part of his effort to *replace* appointed counsel with Mancino and Higgins; at no time did he invoke his *Faretta* right to represent himself.

as his own counsel. *McKaskle*, 465 U.S. at 183, 104 S.Ct. at 953, 79 L.Ed.2d at 136; *State v. Thompson* (1987), 33 Ohio St.3d 1, 6, 514 N.E.2d 407, 414. Yet hybrid representation was precisely what Keenan asked for here. Keenan not only employed the term "co-counsel" repeatedly, he specifically argued that the trial court had discretion to allow hybrid representation.

{¶ 32} By permitting Keenan to act as "co-counsel" for the purpose of examining witnesses, the trial judge gave Keenan all that he asked for (and more, incidentally, than he had any right to demand). Keenan's second proposition of law is waived, and for that reason we overrule it.

### III.    DATE OF OFFENSE

{¶ 33} In his third proposition of law, Keenan contends that the prosecutor "constructively amend[ed] the indictment" by arguing to the jury that the state need not prove the exact date of the offense. However, all four counts of the indictment allege that Keenan committed the charged offenses "*on or about*" September 24, 1988. Hence, the prosecutor's argument conformed to the indictment. Nor did the prosecutor's argument deprive Keenan of fair notice of the charges, since essentially the same dispute over the date took place at his first trial. See *State v. Keenan*, 66 Ohio St.3d at 411, 613 N.E.2d at 210. Keenan's third proposition of law lacks merit.

### IV.    UNRECORDED SIDEBARS

{¶ 34} In his fourth proposition of law, Keenan complains that the trial court denied his pretrial motion to record all sidebars, and held forty-seven unrecorded sidebars during trial. Under Crim.R. 22, *all* proceedings in serious offense cases must be recorded, including sidebars. See *State v. Brewer* (1990), 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491, 502. However, Keenan did not attempt to use App.R. 9 to reconstruct the content of the unrecorded sidebars and show prejudice. Hence, "the error may be considered waived." *Brewer*. See, also, *State v. Tyler* (1990), 50

Ohio St.3d 24, 41-42, 553 N.E.2d 576, 596; *State v. Jells* (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464, 474.

## V.     LESSER INCLUDED OFFENSE

{¶ 35} At trial, the defense requested an instruction on murder as a lesser included offense of aggravated murder under Count One. Count One charged prior calculation and design under R.C. 2903.01(A), and Keenan argued that the jury could reasonably find "that there was no plan." The trial court found the evidence did not support a murder instruction and therefore refused to give one.

{¶ 36} In his twenty-second proposition of law, Keenan argues that the trial court should have instructed on murder as to Count One.

{¶ 37} Keenan presented an alibi defense. Ordinarily, where a defendant presents a complete defense to the substantive elements of the crime, such as an alibi, an instruction on a lesser included offense is improper. See, *e.g.*, *State v. Strodes* (1976), 48 Ohio St.2d 113, 117, 2 O.O.3d 271, 273, 357 N.E.2d 375, 378, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154. In such a case, the defendant is entitled to a lesser included offense instruction only "if, based on the evidence adduced by the state, the trier of fact can find for the defendant * * * on some element of the greater offense which [*sic*] is not required to prove * * * the lesser offense and for the state on the elements required to prove * * * the lesser offense." *State v. Solomon* (1981), 66 Ohio St.2d 214, 20 O.O.3d 213, 421 N.E.2d 139, paragraph two of the syllabus. Hence, Keenan was entitled to a murder instruction only if the jury, viewing the evidence in the light most favorable to the defense, could have had a reasonable doubt as to prior calculation and design, but yet could have found that Keenan purposely killed Klann.

{¶ 38} There was in this case no evidence at all to permit such a finding. Espinoza's testimony, if believed, clearly shows prior calculation and design. According to him, Keenan drove his truck around Little Italy and interrogated Klann while his henchmen held Klann prisoner at knifepoint. Keenan ultimately

drove to a remote area, ordered Klann out of the truck, and asked him one more time where Lewis was. When Klann failed to give a satisfactory answer, Keenan ordered him to tilt his head back. Keenan then cut Klann's throat, led him to and pushed him into the creek. When Klann tried to flee, Keenan ordered D'Ambrosio to finish him off. This sequence of events simply is not consistent with a spur-of-the-moment killing. The jury could not have found murder "based on the evidence adduced by the state." *Solomon*.

{¶ 39} If D'Ambrosio is believed, however, the search for Lewis did not culminate in Klann's murder at all. D'Ambrosio testified that Klann was picked up in Little Italy on Friday morning but was not harmed. The defense claimed that Klann was murdered on Friday night/Saturday morning, a time period for which Keenan had an alibi.

{¶ 40} Here, then, are two "completely divergent stories." *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 532, 415 N.E.2d 303, 308. Neither Keenan nor the state presented any evidence negating prior calculation and design. Thus, the jury was never presented with a reasonable view of the evidence on which it could have convicted Keenan of murder. A murder instruction would have been an improper invitation to the jury to reach a compromise verdict that "could not possibly be sustained by the adduced facts." *Wilkins*, 64 Ohio St.2d at 387, 18 O.O.3d at 531, 415 N.E.2d at 307. Keenan's twenty-second proposition of law is overruled.

## VI.    CLAIM THAT RETRIAL WAS BARRED

{¶ 41} In his twenty-seventh proposition of law, Keenan argues that, under *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, the state was barred from seeking the death penalty upon remand.

{¶ 42} Keenan clearly misreads *Penix*.   There, we held that, when an appellate court reverses *a death sentence* recommended by a jury and remands the cause *for resentencing*, the death penalty may not be reimposed on remand.  We so held because R.C. 2929.03(D) requires that any death sentence be recommended by "the trial jury"; in *Penix*, we held that "the trial jury" is "the same jury that convicted the offender in the guilt phase."  *Penix*, 32 Ohio St.3d at 373, 513 N.E.2d at 747-748.

{¶ 43} The *Penix* rationale obviously does not apply when the defendant's *conviction* is reversed and the cause is remanded for a *new trial*.  In such a case, the jury that convicts the offender on retrial most certainly may impose the death sentence, for then the sentence is recommended by "the same jury that convicted the offender in the guilt phase."

{¶ 44} Keenan also claims that, because we reversed his original conviction on grounds of prosecutorial misconduct, his retrial constituted double jeopardy. Yet it is a fundamental, long-settled principle "that a successful appeal of a conviction *precludes* a subsequent plea of double jeopardy."  (Emphasis added.) *United States v. Scott* (1978), 437 U.S. 82, 89, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65, 73.  The rule is the same under the Ohio Constitution.  See *Sutcliffe v. State* (1849), 18 Ohio 469, 477-479.

{¶ 45} Admittedly, some courts have carved out a narrow exception to this rule.  Where a defendant asks for, and gets, a *mistrial* based on prosecutorial misconduct, the Constitution bars his retrial if the prosecutor's misconduct was calculated to goad the defendant into seeking a mistrial.  See *Oregon v. Kennedy* (1982), 456 U.S. 667, 675-676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416, 424-425.

Certain courts have extended *Kennedy* to bar retrial after an *appellate reversal* based on misconduct calculated or intended to prevent a likely acquittal, even though no mistrial was declared. See, *e.g.*, *United States v. Wallach* (C.A.2, 1992), 979 F.2d 912, 916.

{¶ 46} However, we have twice declined to adopt this exception to the general rule. *State v. Liberatore* (1982), 69 Ohio St.2d 583, 23 O.O.3d 489, 433 N.E.2d 561, was a case involving the gravest prosecutorial misconduct. Yet, paragraph two of our syllabus in *Liberatore* flatly states, "Retrial for the same offense after reversal of a prior conviction on appeal does not constitute a violation of the constitutional provision prohibiting double jeopardy."

{¶ 47} More recently, in *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, we specifically considered the applicability of *Kennedy* to the appellate-reversal situation. We stated, "*Kennedy* * * * is inapplicable * * * for *two* reasons: first, the prosecutorial misconduct * * * was not calculated to goad the accused into seeking a mistrial and, second, *the retrial was the result of reversal on appeal of his prior conviction*." (Emphasis added.) *Id*. at 187, 31 OBR 386-387, 510 N.E.2d at 353.

{¶ 48} Consistent with *Liberatore* and *Sage*, we think it unsound to extend *Kennedy* to retrials after appellate reversals. *Kennedy* expressly states, "If a mistrial were in fact warranted * * * the defendant could in many instances successfully appeal * * * on the same grounds that he urged a mistrial, and the Double Jeopardy Clause would present no bar to retrial." 456 U.S. at 676, 102 S.Ct. at 2090, 72 L.Ed.2d at 425. But, see, *Jacob v. Clarke* (C.A.8, 1995), 52 F.3d 178, 181. Moreover, "the crucial difference between reprosecution after appeal by the defendant and reprosecution after a * * * mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States v. Jorn* (1971), 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556 (plurality

opinion). Accord *Liberatore*, 69 Ohio St.2d at 591, 23 O.O.3d 494, 433 N.E.2d at 567. See, also, *State v. Swartz* (Ia.App.1995), 541 N.W.2d 533, 539.

{¶ 49} We conclude that double jeopardy principles did not bar Keenan's reprosecution on remand. Keenan's twenty-seventh proposition of law is therefore overruled.

## VII. HEARSAY

{¶ 50} In his fifth proposition of law, Keenan complains that Detective Leo Allen gave hearsay evidence during his direct examination.

{¶ 51} Over objection, Detective Allen testified that, on September 27, 1989, D'Ambrosio told him "the last time that he saw [Klann] was about 2:00 * * * Saturday morning, at Coconut Joe's." Allen's recounting of what D'Ambrosio told him was certainly hearsay. However, the admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial. *California v. Green* (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. D'Ambrosio, the declarant, testified in this case as a defense witness. Thus, the admission of his statement to Allen was not constitutional error.

{¶ 52} "Nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict." *State v. Webb* (1994), 70 Ohio St.3d 325, 335, 638 N.E.2d 1023, 1032. Here, there was "substantial other evidence" to support the guilty verdict, and we accordingly find this error harmless.

{¶ 53} Keenan's remaining hearsay claims were not preserved by objection at trial. Thus, they are waived, absent plain error. We find that none of the alleged hearsay statements, singly or together, reaches the level of plain error. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Hence, we need not reach their merits. Keenan's fifth proposition of law is rejected.

## VIII.    EXPERT OPINION

**{¶ 54}** Dr. Elizabeth Balraj, who performed the autopsy on Klann, testified that the deepest of Klann's stab wounds was eight inches deep, but that a blade only four or five inches long "*could* cause that kind of an injury."  (Emphasis added.)  Balraj then identified three knives that police had given her for examination and measurement.  Balraj testified that Klann's injuries "*could* have been inflicted by any or all of these three exhibits."  (Emphasis added.)

**{¶ 55}** In his sixth proposition of law, Keenan claims Balraj's opinion was inadmissible because it was not stated in terms of probability.  However, Keenan did not object to this testimony.  He thus waived this issue, absent plain error.  In the case of Keenan's co-defendant, involving similar testimony by the same witness about the same facts and exhibits, we held that the alleged error was not plain error.  *State v. D'Ambrosio,* 67 Ohio St.3d at 191, 616 N.E.2d at 915.  We so hold here as well, and thus overrule Keenan's sixth proposition of law.

## IX.    REFERENCE TO DEFENDANT'S INCARCERATION

**{¶ 56}** In his seventh proposition of law, Keenan complains that the trial court called to the jury's attention the fact that Keenan was being held in jail.  This proposition, we find, is based on a simple misreading of the record.  On April 27, 1994, the court's morning session began late.  The trial judge explained the delay to the jury:

"* * * [T]his Court had a sentencing in another case, scheduled for 9:00 a.m., a five-minute sentencing hearing, which we ordinarily would do prior to starting in the morning.

"The Jail, not our deputies here, but the Correction people downstairs, were not able to either locate or bring the defendant up until 10:00 a.m."

**{¶ 57}** This reference to "the defendant" clearly meant the defendant in the *other* case, whose sentencing had been scheduled for 9:00 a.m.  We see no

14

reasonable possibility that the jury could have misconstrued the judge's remarks as referring to Keenan. Thus, Keenan's seventh proposition of law is meritless.

## X.    SHACKLED WITNESS

{¶ 58} In his eighth proposition of law, Keenan complains that handcuffs were placed on D'Ambrosio after he was brought into court as Keenan's witness. Generally, "a defendant has a right to have his witnesses appear free of shackles, except * * * where there is evident danger of escape or harm to individuals in the courtroom. The decision * * * is left to the sound discretion of the trial judge." *Kennedy v. Cardwell* (C.A.6, 1973), 487 F.2d 101, 105, fn. 5.

{¶ 59} Although a witness's prisoner status alone may not warrant shackling, a witness's serious criminal record and history of violence may justify a trial court's security concerns. See *Wilson v. McCarthy* (C.A.9, 1985), 770 F.2d 1482, 1485; *United States v. Amaro* (C.A.7, 1987), 816 F.2d 284, 285-286. But, see, *State v. Coursolle* (1959), 255 Minn. 384, 389, 97 N.W.2d 472, 476-477 (shackling impermissible unless witness does something at time of trial to justify it). Moreover, handcuffing a witness is "much less" prejudicial than handcuffing a defendant, *Kennedy v. Cardwell* at 109, and thus logically should not require as much justification.

{¶ 60} As a condemned murderer, D'Ambrosio could be presumed dangerous. Moreover, he had the greatest possible incentive to escape and was "beyond the deterrent reach of the law." *United States v. Fountain* (C.A.7, 1985), 786 F.2d 790, 794. Moreover, D'Ambrosio entered the courtroom without handcuffs on, and the handcuffs were placed on him outside the presence of the jury. Finally, the state's key witness, Espinoza, was also handcuffed.[3] Cf. *United States v. Garcia* (C.A.7, 1980), 625 F.2d 162, 167-168; *Payne v. Commonwealth*

---

3. Keenan points out that state's witness Paul Lewis was not handcuffed, although he was serving a sentence in Indiana at the time of the trial. But Lewis, unlike Espinoza and D'Ambrosio, was not a convicted murderer.

(1987), 233 Va. 460, 466, 357 S.E.2d 500, 504. Under the totality of the circumstances, we conclude that the trial judge did not abuse his discretion in ordering D'Ambrosio handcuffed.

## XI. PRESENTATION OF FORMER TESTIMONY

{¶ 61} Keenan in his eighth proposition of law also contends that the trial court discriminated against the defense by using two different procedures in presenting the former testimony of unavailable witnesses pursuant to Evid.R. 804(B)(1). In presenting the former testimony of prosecution witness James Russell, the prosecutor and defense counsel read the questions from the transcript, the trial court played the judge's role, and the court's bailiff read Russell's testimony. But in presenting the former testimony of defense witnesses Steven Gaines and David Oliver, the bailiff read the entire transcript—questions and answers both.

{¶ 62} However, the defense not only assented to, but actually suggested, the latter method of presentation. If there was any error here, it was invited error, and Keenan may not capitalize on it. Cf. *State ex rel. Fowler v. Smith* (1994), 68 Ohio St.3d 357, 359, 626 N.E.2d 950, 952.

## XII. MISCELLANEOUS GUILT PHASE ISSUES

{¶ 63} In his ninth proposition of law, Keenan complains that various trial-court rulings improperly interfered with his defense.

### A

{¶ 64} James Russell, who had testified at Keenan's first trial and at D'Ambrosio's trial, was unavailable for Keenan's retrial. The state therefore introduced Russell's testimony from Keenan's first trial. See Evid.R. 804(B)(1). Keenan claims he tried to introduce portions of Russell's testimony from D'Ambrosio's trial, but the judge excluded them. Keenan contends that the trial judge should have admitted Russell's testimony from *D'Ambrosio* because it was inconsistent with Russell's testimony in Keenan's first trial. However, the two

portions of the record cited by Keenan do not support Keenan's claim that he tried to introduce Russell's *D'Ambrosio* testimony.

{¶ 65} Early in the trial, the prosecutor requested that Russell's testimony from Keenan's first trial be read to the jury, explaining to the judge that the state had tried and failed to locate Russell. A discussion of Russell's unavailability followed. At no point in this discussion did the admissibility of Russell's *D'Ambrosio* testimony come up.

{¶ 66} Subsequently, the state actually introduced Russell's testimony from the previous trial. After an off-the-record sidebar, the trial judge stated:

"They just informed me * * * that Mr. Russell testified in the D'Ambrosio trial.

"The Court is ruling that the materials were substantially the same, in the material portion of it. I am going to allow the transcript to be read.

"MR. KERSEY [defense counsel]: It is from the Keenan trial, the first Keenan case.

"THE COURT: I am going to allow that to be read.

"MR. KERSEY: Not the D'Ambrosio trial, because what the Court is ruling, if I understand the Court, that is substantially the same. There is nothing * * * materially inconsistent."

{¶ 67} Nothing in this discussion reflects any defense attempt to introduce Russell's *D'Ambrosio* testimony. (In fact, this discussion took place during the *state's* case-in-chief.) Nor does the discussion indicate that the trial court had closed the door to any subsequent defense use of the *D'Ambrosio* testimony. The defense simply made no attempt to use it.

{¶ 68} Moreover, Russell's testimony in Keenan's first trial is consistent with what Keenan claims Russell said in D'Ambrosio's trial. Contrary to Keenan's claim, Russell did *not* testify in Keenan's first trial that Kennan was carrying a gun in his pocket. He testified that he saw an object that looked like a gun; that, on

second thought, he did not believe the object was a gun; and that the object could have been a boot-shaped key ring that Keenan owned. And that is precisely what Keenan claims Russell said in *D'Ambrosio*. Hence, any error would be nonprejudicial.

## B

{¶ 69} Keenan complains that the trial judge would not let him cross-examine Lewis as to whether Lewis was in jail between June and August 1988. Keenan claims this was relevant because Lewis was imprisoned "at the time of the occurrence of these events." That claim is false. Klann was murdered in *September* 1988.

## C

{¶ 70} On direct examination, the defense asked Patrick Keenan (appellant's brother) about a conversation he had with Adam Flanik in 1989. The state's objection was sustained.

{¶ 71} Keenan claims Flanik said something to Patrick that was inconsistent with Flanik's testimony. But Keenan did not proffer Patrick's testimony into the record. His failure to do so waives any claim of error stemming from the exclusion of that testimony. Evid.R. 103(A)(2). (Moreover, Keenan concedes that he did not give Flanik an opportunity to explain or deny his alleged inconsistent statement before offering it into evidence. Hence, extrinsic evidence of the statement was inadmissible in any event. Evid.R. 613[B].)

## D

{¶ 72} Keenan's father testified for the defense. On cross-examination, he admitted that he had not testified at his son's first trial. Asked on redirect why he had not, Keenan's father replied, "It was determined by counsel that no defense would be presented." The state objected because the witness was not Keenan's counsel and did not personally know what counsel decided. The trial court did not rule on this point, but stated (outside the jury's hearing) that the testimony "is

completely inaccurate" because Keenan had presented a defense at his first trial. The judge struck the question and answer and instructed the jury to disregard them.

{¶ 73} Appellant correctly argues that a trial judge cannot strike testimony simply because he thinks it inaccurate. However, we find the error harmless beyond a reasonable doubt. The testimony at issue was inadmissible for the reason given in the state's original objection—a witness may not testify absent evidence that he has personal knowledge of what he testifies to. Evid.R. 602. The defense never showed how Keenan's father knew that "[i]t was determined by counsel that no defense would be presented." Cf. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614-615, 614 N.E.2d 742, 745 (correct judgment will not be reversed because erroneous reason given for it). Moreover, the testimony went to a collateral issue, and the judge did not stigmatize it as inaccurate in front of the jury.

E

{¶ 74} Keenan complains that the trial court would not allow his counsel to inspect the police report of Cleveland Police Detective Ernest Hayes. Under Crim.R. 16(B)(1)(g), after a witness's direct examination, opposing counsel may request an *in camera* inspection of the witness's "written or recorded statement" to determine whether it is inconsistent with his testimony. "Statement" includes police reports to the extent they contain the officer's "observations and recollection[s]," but not "portions which recite matters beyond the witness' personal observations." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 225, 15 OBR 311, 364, 473 N.E.2d 264, 316.

{¶ 75} However, Hayes's report is not in the record. Review of this issue is therefore impossible. At trial, Keenan neither requested the report's inclusion in the record nor objected to its omission. Consequently, he has waived this issue. *Jenkins* at 226, 15 OBR at 365, 473 N.E.2d at 316.

F

{¶ 76} Keenan complains that the trial court allowed the state to cross-examine D'Ambrosio about his aggravated murder conviction. Actually, the defense elicited that fact on direct. The prosecutor did elicit that D'Ambrosio was on death row, but D'Ambrosio had testified that he had discussed the case with Keenan. The prosecutor was entitled to explore how D'Ambrosio could have done that while "in isolation" on death row. Contrary to Keenan's claim, D'Ambrosio never testified that *Keenan* was on death row.

G

{¶ 77} Keenan argues that the trial judge biased the jury by questioning D'Ambrosio in such a way as to indicate doubt. Keenan accuses the trial judge of "denigrating" Father Louis O'Reilly, a defense witness, by making comments and asking him certain questions about his background. Keenan never objected to any of these questions or statements. These issues are therefore waived.

{¶ 78} Keenan further alleges that the trial court, in questioning other defense witnesses, insulted them and otherwise showed his bias against the defense. Keenan's record citations do not support these claims.

H

{¶ 79} Although the statement is not made part of the record, Keenan complains that during voir dire, the trial judge referred to one of the prosecutors as a "rising star" in the presence of the venire. Keenan did not object, and this trivial pleasantry could hardly be plain error. Similarly, when the judge introduced several judges who were visiting the courtroom, Keenan did not object. We see no conceivable impropriety or prejudice in this, and no plain error.

{¶ 80} Keenan claims that the judge misinformed the jury in the guilt-phase instructions. In fact, the judge never said any of the things Keenan attributes to him. He did not say that Keenan was with Klann at the time of Klann's death. He did not say that Keenan was part of a conspiracy; he merely instructed on conspiracy. He did not say that Keenan was charged with felonious assault; he

20

correctly said that the state alleged purpose to commit several felonies, including felonious assault, as the "purpose" element of aggravated burglary. He did not say that Keenan planned to murder Lewis; he said that the state so alleged. He did not tell the jury to ignore Keenan's alibi; he said that the state did not have to prove the date of the offense.

{¶ 81} Espinoza testified that there "might have been a little light rain, drizzle" when Klann was picked up. On cross, defense counsel asked: "Didn't you * * * say * * * it was drizzling when you bumped into Anthony?" The judge interjected, "He said light drizzle." Keenan did not object, and we find no plain error.

I

{¶ 82} Keenan claims that the judge "told the jury that the Grand Jury had determined prior calculation and design." What Keenan means is that, during voir dire, the judge read the indictment to the venire. Keenan did not object to this.

{¶ 83} Also during voir dire, the judge explained the concepts of aggravation and mitigation to two veniremen by saying that the state might present evidence that the defendant was a "nasty" or "vicious" person, and the defense might attempt to show that he was "a good person" or "a real nice fellow." However, the defense did not object. Keenan also accuses the trial court of refusing to discharge two "obviously biased" veniremen for cause. But Keenan expressly declined to challenge either venireman for cause. Both these issues are waived.

J

{¶ 84} Keenan claims that the court erroneously excluded a written statement by prosecution witness Nancy Somers. However, Keenan did not present this issue to the court of appeals. Consequently, it is waived.

K

{¶ 85} Finally, Keenan complains that by authorizing his execution to be broadcast, the judge biased the jury. But the jury had already rendered its verdicts when the trial judge made his remarks about broadcasting the execution.

{¶ 86} Keenan's ninth proposition of law is rejected *in toto*.

## XIII.   PROSECUTORIAL MISCONDUCT

{¶ 87} In his tenth proposition of law, Keenan alleges that the prosecutor repeatedly commented during guilt-phase closing argument on his failure to testify. See, generally, *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. However, Keenan objected to none of these statements at trial. Hence, any error is waived unless it is plain error.

{¶ 88} Although Keenan did not testify at trial, the prosecutor stated:

"The defendant testified in this case through various means. What is the first time he testified? When he was arrested on Tuesday he told Detective Leo Allen * * * on that Friday evening that he was out at a person's house. That is his first testimony."

{¶ 89} The prosecutor then said, "The second time [Keenan] talks to us" was in his letter to Espinoza. Later, the prosecutor said, "He talks to us through his alibi," and "The alibi is the third time the defendant speaks to us * * *."

{¶ 90} These could be construed as indirect comments on Keenan's silence. By repeatedly applying the word "testimony" to Keenan's out-of-court statements, the remarks tended to direct the jury's attention toward Keenan's refusal to testify *in* court. While not "manifestly intended" to reflect on the accused's silence, these remarks may have been "of such character" that the jury would have taken them as such. (Internal quotation marks omitted.) *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 6 O.O.3d 377, 382, 370 N.E.2d 725, 733, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157.

{¶ 91} However, the trial court instructed the jury that Keenan's failure to testify could not be considered for any purpose. Because of that, the indirect nature

of the comments at issue, and the strength of the state's evidence, the prosecutor's comments do not clearly appear to be outcome-determinative. We find no plain error.

{¶ 92} Keenan claims the prosecutor made four other comments on his failure to testify.[4] However, these comments were even less direct than those addressed above; indeed, it is doubtful whether they could even be construed as comments on Keenan's failure to testify. Thus, we can say without hesitation that no plain error exists with respect to these comments.

{¶ 93} In the absence of plain error, Keenan's claims are waived, and he is not entitled to a decision on their merits. On that basis, we overrule Keenan's tenth proposition of law.

{¶ 94} Keenan also claims prosecutorial misconduct in his eleventh proposition of law. However, he did not object to any of this alleged misconduct at trial. His claims are waived.

{¶ 95} In his twelfth proposition of law, Keenan identifies more examples of alleged prosecutorial misconduct. Keenan accuses the prosecution of objecting when his counsel asked for mercy. This assertion is inaccurate. The state's objections actually went to defense counsel's statement of personal opinion and evidence outside the record.

{¶ 96} Keenan also complains because the prosecutor argued to the trial judge that Espinoza's plea bargain was completed and did not include his testimony in the retrial. Even if this argument is incorrect, we do not see how advancing it

---

4. The prosecutor stated that "there was no contradiction" to Lewis's testimony that Keenan gave him drugs to settle a debt. See *State v. Ferguson* (1983), 5 Ohio St.3d 160, 163, 5 OBR 380, 383, 450 N.E.2d 265, 268, and paragraph one of the syllabus; *Butler v. Rose* (C.A.6, 1982), 686 F.2d 1163, 1170-1171 (*en banc*). The prosecutor asked, "How do you explain" Keenan's letters to witnesses and "[W]here was he when his two buddies were arrested?" Finally, the prosecutor said (sarcastically, we take it), "[A]nd of course, when [Keenan] finds out that his good friends are arrested, and they got his truck, he runs down to the Police Department and says, hey, what's going on here? You got my truck. You got my employees. What happened?"

constituted misconduct. In any case, it had no effect on the trial. The defense was permitted to cross-examine Expinoza on the plea bargain and to voir dire veniremen on their reaction to it.

{¶ 97} Keenan argues that the prosecutor improperly cross-examined defense witnesses on whether they had come forward to testify at the first trial. Keenan cites R.C. 2945.82, which provides, "When a new trial is * * * awarded on appeal, the accused shall stand for trial upon the indictment or information as though there had been no previous trial thereof."

{¶ 98} We do not read this as meaning that a previous trial can never be mentioned in any way during a retrial of the same cause. Rather, we think it means simply that there is no requirement for a new indictment or information when a case is remanded for retrial.

{¶ 99} Keenan's interpretation would bring the statute into potential conflict with Evid.R. 611(B): "Cross-examination shall be permitted on all * * * matters affecting credibility." A witness's failure to come forward earlier with relevant information certainly affects his credibility. A statute conflicting with a valid procedural rule promulgated by this court is of no force. Section 5(B), Article IV, Ohio Constitution. Thus, Keenan's interpretation would raise serious questions about the constitutionality of R.C. 2945.82. We decline to adopt such an interpretation when an equally plausible alternative reading of the statute would avoid any constitutional problems. A court is bound to give a statute a constitutional construction, if one is reasonably available, in preference to one that raises serious questions about the statute's constitutionality. See, *e.g.*, *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.* (1995), 73 Ohio St.3d 260, 269, 652 N.E.2d 952, 960. We therefore reject Keenan's reading of R.C. 2945.82 and hold that the prosecutor's questions did not violate it.

{¶ 100} Keenan's remaining claims under this proposition of law involve questions and statements by the prosecution to which Keenan did not object at trial. These issues are waived, and Keenan's twelfth proposition of law is without merit.

## XIV. INSTRUCTIONAL ISSUES

{¶ 101} The trial court instructed that "complicity" means, *inter alia*, "that a person * * * conspired with another to commit an offense." The court also defined "conspiracy." In his thirteenth proposition of law, Keenan contends that the court should not have instructed on conspiracy. Because the indictment did not charge conspiracy, Keenan argues, instructing on it altered the charge without notice.

{¶ 102} Keenan's claim is meritless. One who "[c]onspire[s] with another to commit [an] offense in violation of [R.C.] 2923.01" is also guilty of complicity under R.C. 2923.03(A)(3). R.C. 2923.03(F) states, "A charge of complicity may be stated in terms of this section, or *in terms of the principal offense*." (Emphasis added.) This provision places defendants on notice that the jury may be given a complicity instruction even though the defendant has been charged as a principal offender. *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408.

{¶ 103} In Keenan's fourteenth proposition of law, he contends that because the trial court instructed on conspiracy, he should have been sentenced for conspiracy, not aggravated murder. This claim is meritless. Keenan was not prosecuted for the substantive offense of conspiracy, but for aggravated murder. The instructions properly permitted the jury to find him guilty of aggravated murder based on a finding that he conspired to commit aggravated murder, and therefore was complicit in the commission of aggravated murder. Keenan's fourteenth proposition of law is overruled.

{¶ 104} Keenan's fifteenth through nineteenth, twenty-first, and twenty-third through twenty-sixth propositions of law deal with instructions to which Keenan did not object at trial. See Crim.R. 30(A). Keenan's "failure to object before the jury retire[d] in accordance with the second paragraph of Crim.R. 30(A),

absent plain error, constitutes a waiver." *State v. Williford* (1990), 49 Ohio St.3d 247, 251, 551 N.E.2d 1279, 1283.

{¶ 105} Having closely examined the record, we cannot find that any of these alleged errors were of such a nature that, had they not occurred, the outcome of the trial clearly would have been otherwise. *State v. Long*. Without inquiring into their merits, therefore, we overrule propositions of law fifteen through nineteen, twenty-one, and twenty-three through twenty-six.

{¶ 106} Similarly, propositions of law twenty-nine, thirty, and thirty-three attack penalty-phase instructions to which the defense made no objection in the trial court. These propositions, too, are waived, and we overrule them.

## XV. INEFFECTIVE ASSISTANCE

{¶ 107} In his twentieth proposition of law, Keenan claims ineffective assistance of trial counsel.

{¶ 108} Ineffective-assistance claims are evaluated in a two-step process. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington* (1984), 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

{¶ 109} Keenan argues that his trial counsel should have objected when the prosecutor elicited testimony from Espinoza and Rosell concerning the contents of letters Keenan had sent them. Such an objection would have had merit: under the Best Evidence Rule, Evid.R. 1002, the state should have introduced the actual letters, rather than proving their content by testimony.

{¶ 110} However, defense counsel may well have preferred *not* to force the state to comply with the Best Evidence Rule. Had the letters been introduced, they would have gone to the jury room during deliberations, along with the other

26

exhibits. Defense counsel could reasonably conclude that Keenan's letters would do less damage as testimony—which would not follow the jurors into the jury room—than as exhibits, which would be physically present at all times during the jury's deliberations. Thus, we can find neither deficient performance nor prejudice in defense counsel's decision.

{¶ 111} Keenan further argues that defense counsel should have made a number of other objections to evidence, argument, and instructions. But, as to evidence and argument, many lawyers recognize the wisdom of keeping objections to a minimum. See, *e.g.*, *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, 352. As to the instructions, none of Keenan's claims is so clearly meritorious that a reasonable attorney would have had to raise it.

{¶ 112} Keenan claims that defense counsel mishandled closing argument by suggesting "a possible homosexual love triangle" among Klann, Lewis, and Espinoza. We agree that there was no evidence of such a relationship, but Keenan's claim that this argument "insult[ed]" the jurors is sheer speculation, insufficient to show prejudice.

{¶ 113} Keenan claims that his trial counsel did not challenge a certain venireman for cause. This claim is simply false.

{¶ 114} Keenan's ineffective-assistance claims lack merit. Keenan barely tries even to show deficient performance or resulting prejudice; instead, he makes shotgun claims and accuses his trial counsel, wholly without evidence, of deliberately sabotaging his defense in collusion with the state. Keenan's twentieth proposition of law is overruled.

## XVI. SENTENCING ISSUES

{¶ 115} In the penalty phase, the trial judge instructed the jury that its recommendation of death "is not binding upon the Court," that "the final decision" rested with the court, and that "[in] the final analysis * * * the Judge will make the [penalty] decision." In his twenty-eighth proposition of law, Keenan claims that

these instructions violated *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. However, the instructions were accurate and were not made to induce reliance on the appellate process. Hence, they did not violate Keenan's constitutional rights. See, *e.g.*, *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674, 682; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81.

{¶ 116} In the penalty phase, the trial judge instructed, "You will be called upon to decide * * * whether or not the defendant in the first place produced evidence as to any of the statutory [mitigating] factors and other non-statutory factors, that is, [whether] the defendant has met his burden of going forward with evidence of any factors in mitigation * * *."

{¶ 117} In his thirty-first proposition of law, Keenan claims that the trial judge considered nonstatutory aggravating circumstances in sentencing him to death. The judge stated from the bench "that this was a vicious killing devoid of any human compassion," and in the sentencing opinion, he mentioned Keenan's "refus[al] to take responsibility" for Klann's death.

{¶ 118} Nevertheless, the opinion gives no indication that the judge weighed these facts as aggravating circumstances. The opinion specifically identifies the single aggravating circumstance pleaded and proved by the state. Consequently, this proposition lacks merit.

{¶ 119} Although only one aggravating circumstance was charged in the indictment, the trial judge referred several times to "aggravating circumstance*s*" in the plural. In his thirty-second proposition of law, Keenan claims that these inaccurate plural references tainted the jury's recommendation. But he did not object at the time, and these trivial verbal slips do not amount to plain error. Keenan has waived this issue, and his thirty-second proposition of law is overruled.

{¶ 120} In his thirty-seventh proposition of law, Keenan argues that kidnapping cannot serve as an aggravating circumstance to support the death

penalty for aggravated murder because the General Assembly has prescribed a sentence of fifteen to twenty-five years for kidnapping alone. This is a *non sequitur*. He also argues that kidnapping cannot serve as both an element of aggravated murder and an aggravating circumstance. We rejected a similar argument in *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237. Keenan's thirty-seventh proposition of law is without merit.

{¶ 121} In orally pronouncing sentence from the bench, the trial judge stated that he was authorizing "the warden or authorities in charge of executing this sentence [of death] to permit and allow, if they so desire, representatives of television, radio, and media to be present and have access *to broadcast such procedure*." (Emphasis added.) The trial judge's statement is the subject of Keenan's thirty-eighth proposition of law.

{¶ 122} We agree with Keenan that no statute permits prison authorities to allow the broadcasting of executions.[5] However, the trial judge's statement from the bench regarding broadcasting was not incorporated in the trial court's journal entries. Consequently, it has no force: a court of record speaks only through its journal. See, *e.g.*, *Schenley v. Kauth* (1953), 160 Ohio St. 109, 51 O.O. 30, 113 N.E.2d 625, paragraph one of the syllabus. In addition, the judge's statements were made after the verdict was returned and therefore could not have prejudiced the jury. Keenan's thirty-eighth proposition of law is therefore overruled.

{¶ 123} In his thirty-ninth proposition of law, Keenan raises various long-discredited arguments against the Ohio death penalty statutes. We summarily reject this proposition. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; *State v. Spisak* (1988), 36 Ohio St.3d 80, 521 N.E.2d 800.

---

5. Television and radio reporters *may be present* at executions pursuant to R.C. 2949.25(A)(7) and (B), however.

**{¶ 124}** In his thirty-fourth proposition of law, Keenan claims that, because the felony-murder charged in Count Two was predicated on the kidnapping of Anthony Klann, the trial court should have merged Count Two with the kidnapping count under R.C. 2941.25. However, aggravated murder and kidnapping are not allied offenses of similar import under R.C. 2941.25. See *State v. Powell* (1990), 49 Ohio St.3d 255, 261, 522 N.E.2d 191, 198; *State v. Buell* (1986), 22 Ohio St.3d 124, 141-142, 22 OBR 203, 218, 489 N.E.2d 795, 810-811; *State v. Logan* (1979), 60 Ohio St.2d 126, 135, 14 O.O.3d 373, 379, 397 N.E.2d 1345, 1352. A kidnapping can take place without an aggravated murder, and an aggravated murder can take place without a kidnapping. Cf. *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242.

**{¶ 125}** Keenan further claims that sentencing him on both counts imposed multiple punishments for the same offense, and thus constituted double jeopardy. However, because R.C. 2941.25 authorizes the imposition of punishment for both offenses, Keenan's multiple-punishment double-jeopardy claim fails. See *State v. Moss* (1982), 69 Ohio St.2d 515, 518-520, 23 O.O.3d 447, 448-450, 433 N.E.2d 181, 184-185.

**{¶ 126}** Finally, Keenan argues that sentencing him both for kidnapping and for a felony-murder predicated on the same kidnapping is cruel and unusual punishment because it was "disproportionate" to the gravity of the offenses. See, generally, *Harmelin v. Michigan* (1991), 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836. This claim is, to put it mildly, unpersuasive. Keenan's thirty-fourth proposition of law is overruled.

## XVII.   INDEPENDENT REVIEW

**{¶ 127}** Because this court is upholding Keenan's convictions on both counts of aggravated murder, and because both counts involve the same victim, the two counts merge for sentencing purposes. See, *e.g.*, *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902, 913.

{¶ 128} The sole aggravating circumstance here is that Keenan committed the aggravated murder of Anthony Klann during a kidnapping. The testimony of Espinoza, Russell, and Flanik clearly supports the guilty verdict. Espinoza saw Keenan cut Klann's throat and also testified that Klann was forced into the truck and confined there. Russell and Flanik corroborated much of Espinoza's account. Flanik testified that he saw D'Ambrosio holding Klann at knifepoint in the truck.

{¶ 129} Next, we must independently determine whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 130} Keenan called his parents and his brother Patrick as witnesses in the penalty phase. They testified that they loved Keenan and could not believe he was guilty. They described the pain that Keenan's plight was putting their family through. Finally, they begged the jury to spare his life. We think this testimony deserves little weight in mitigation.

{¶ 131} Keenan made an unsworn statement claiming innocence. He said he was at a party in either Pepper Pike or Strongsville on Friday night, September 23, 1988. During the guilt phase, Detective Allen had testified that Keenan told him he was at Nancy Somers's house in Pepper Pike that night. Keenan disputed Allen's version of that conversation: "[M]y actual original statement said one night I was in Pepper Pike, one night in Strongsville and I honestly didn't know which one was where. Of course, to fit their case the police only put down the Pepper Pike thing."

{¶ 132} The mitigation adduced here was weak indeed. We conclude that the aggravating circumstance in this case outweighs the mitigating factors beyond a reasonable doubt. Thus, we find the death penalty to be appropriate.

{¶ 133} Finally, this court must determine whether the death sentence here is proportionate to those approved in similar cases. We conclude that it is. We have approved the death penalty in several cases where kidnapping was the only aggravating circumstance present. See, *e.g.*, *State v. Brewer* (1990), 48 Ohio St.3d

50, 64, 549 N.E.2d 491, 504; *State v. Jells* (1990), 53 Ohio St.3d 22, 36, 559 N.E.2d 464, 477; *State v. Fox* (1994), 69 Ohio St.3d 183, 195, 631 N.E.2d 124, 134.

{¶ 134} In the case of Keenan's co-defendant D'Ambrosio, we affirmed the death penalty despite the existence of somewhat stronger mitigation than Keenan presented here. *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 652 N.E.2d 710. Unlike Keenan, D'Ambrosio showed that he had no criminal record and a good military record. Moreover, he was younger than Keenan and, although a principal offender, played a lesser role in this crime. Finally, D'Ambrosio introduced evidence that he was a generally nonviolent person for whom this crime was out of character. 73 Ohio St.3d at 145-146, 652 N.E.2d at 715 (majority opinion); see, also, *id.* at 148, 652 N.E.2d at 716-717 (dissenting opinion). If death is the appropriate penalty for D'Ambrosio, it is surely the appropriate penalty for Keenan as well. Accordingly, we find the death sentence to be proportionate to sentences approved in similar cases.

{¶ 135} The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

MOYER, C.J., and PFEIFER, J., concur in part and dissent in part.

———————————

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 136} I concur in the holding of the majority that affirms the conviction and sentence of death on count two, aggravated murder, R.C. 2903.01(B) (felony-murder); count three, kidnapping; and count four, aggravated burglary. However, I must respectfully dissent as to the conviction on count one, aggravated murder under R.C. 2903.01(A) (prior calculation and design).

{¶ 137} As this court has observed in several cases, the General Assembly in 1974 reclassified first-degree murder as "aggravated murder" and changed the traditional requirement of "deliberate and premeditated malice" to a more stringent

32

element, "prior calculation and design." See 134 Ohio Laws, Part II, 1866, 1900, Am.Sub.H.B. No. 511; *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus; *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, 88.

{¶ 138} The 1973 Technical Committee Comment to Am.Sub.H.B. No. 511, a Legislative Service Commission summary, clearly states that R.C. 2903.01, which made "prior calculation and design" the requisite element of intent in the crime of aggravated murder, "restates the former crime of premeditated murder so as to embody the classic concept of the planned cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment." See *State v. Taylor* at 19, 676 N.E.2d at 88.

{¶ 139} The General Assembly adopted the new requirement of "prior calculation and design" to explicitly supersede court decisions that have held that murder could be deemed premeditated even though the fatal plan was conceived and executed on the spur of the moment. See, *e.g.*, *id.*, *State v. Taylor; State v. Stewart* (1964), 176 Ohio St. 156, 27 O.O.2d 42, 198 N.E.2d 439; *State v. Schaffer* (1960), 113 Ohio App. 125, 17 O.O.2d 114, 177 N.E.2d 534. Despite this explicit clarification of legislative intent and the General Assembly's clear statement on this issue, a majority of this court continues to disregard the policy of the law by extending the application of prior calculation and design beyond the statutory language.

{¶ 140} Construing the testimony in the light most favorable to the prosecution as required under *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, there is still insufficient evidence to find that Keenan killed Klann with prior calculation and design. The state presented no evidence that would lead a reasonable juror to believe that Keenan had calculated,

schemed, or planned to kill Klann prior to their arrival at the creek. Unlike Espinoza and D'Ambrosio, Keenan did not take a weapon with him when he and the others went looking for Lewis. Further, Keenan was the only one of the three men who did not strike or threaten Klann with a weapon during the search for Lewis. The fact that Keenan drove around with Klann in the truck, or that he questioned him about Lewis's whereabouts, or even that he failed to intervene when D'Ambrosio and Espinoza threatened and hit Klann while trying to get information from him, does not prove that Keenan schemed to kill Klann. Keenan's only demonstrated purpose was to find Lewis. There is no evidence even to suggest that Keenan felt any animosity towards Klann. Further, although Keenan was looking for Lewis, there is not any evidence to suggest that Keenan had intended to kill Lewis if he found him. The testimony of the state's witnesses indicates that Espinoza, not Keenan, had threatened to kill Lewis and had also been fighting with Klann earlier in the evening.

{¶ 141} Once the men arrived at the creek, Keenan ordered Klann to get out of the truck. Espinoza testified that shortly thereafter, Keenan asked Klann where Lewis was, and at this point he may have had D'Ambrosio's knife. No evidence suggests that Keenan intended to kill Klann even at this point. Keenan had demonstrated a serious intent to find Lewis, but aside from the frustration of not getting the information he wanted, there was still no indication that he had any animosity toward Klann. No evidence showed that Klann would have been killed if he had been able to tell Keenan where he could find Lewis and, undeniably, no evidence even suggests a "studied care in planning or analyzing the means of the crime" or a "scheme encompassing" Klann's death. Technical Committee Comment to Am.Sub.H.B. No. 511 (R.C. 2903.01); *State v. Taylor* at 19, 676 N.E.2d at 88.

{¶ 142} When Klann did not tell Keenan where Lewis could be found, Keenan cut Klann's throat. Keenan let Klann wander around for a few moments,

and pushed him in the creek. The testimony indicates that Keenan then passed the knife to D'Ambrosio and told him to "finish him." D'Ambrosio jumped into the creek and stabbed Klann until he died. This entire chain of events could have taken place in a matter of a couple of minutes and appears to have erupted "on the spur of the moment" when Keenan became frustrated because he did not get the information he wanted from Klann. Despite the violent nature of this crime, the evidence is insufficient to permit a finding that Keenan planned or analyzed with studied care a scheme "designed to implement the calculated decision to kill" Klann and the means of doing so. *State v. Cotton* at paragraph three of the syllabus. While these facts unquestionably support a finding of an intentional killing, this case falls short of the degree of prior calculation required by Am.Sub.H.B. No. 511 (R.C. 2903.01).

PFEIFER, J., concurs in the foregoing opinion.

_____