JOURNAL ENTRY and OPINION
Defendant-appellant Dakarai Tichavakunda appeals from his conviction after a jury trial for aggravated murder with a firearm specification.
Appellant asserts his conviction is neither based upon sufficient evidence nor sustained by the weight of the evidence. Appellant further asserts his right to a fair trial was compromised by the prosecutor's improper use of a peremptory challenge during the jury voir dire and improper remarks during closing argument. Appellant also asserts the trial court committed error in permitting the introduction of inadmissible evidence and in instructing the jury.
After a review of the record, this court concludes both that appellant's conviction is supported and that the trial court's actions were appropriate. This court further concludes that although the prosecutor's conduct skirted the edge of professional propriety, it did not rise to the level of reversible error. Appellant's conviction, therefore, is affirmed.
Appellant's conviction results from an incident that occurred late in the evening of May 4, 2000. At approximately 7:00 p.m., nineteen-year-old Shawn Ward reported for work at his place of employment, the Taco Bell restaurant located on Euclid Avenue at the intersection of Mount Union Avenue in East Cleveland, Ohio. His shift manager, Darlene Medley, assigned him to the "drive-thru" window.[1] At approximately 10:00 p.m., Ward's fellow employee and friend Kenyon "got off" work for the night and left the premises. Ward continued to service customers.
Some time later, Ward served a customer who had ordered "extra sauce." The man, later identified as Adolph Shepard, drew Ward's particular attention because, after receiving his order, Shepard drove ahead only a short way toward Euclid Avenue before stopping his vehicle. Ward watched, concerned that his customer's order may have been incomplete. From the "drive-thru" window, Ward observed Shepard, at the end of the driveway, still in his vehicle, "arguing with someone."
Ward thought first Shepard "was yelling at me like he didn't get all of his food or something." Then he noticed Shepard actually appeared to be addressing a man in a "white shirt." The man, later identified as Vonice Jamison ("Von"), stood outside Shepard's vehicle. As Ward watched, Shepard drove out onto Euclid Avenue, turned onto Mount Union, then stopped and exited to stand at the driver's side of his vehicle. Although Shepard continued to argue with the nearby Jamison, Ward's attention was drawn away by the need to serve other customers.
At approximately 10:45 p.m., James Cummins stopped his minivan at the street curb opposite the house located at 1827 Mount Union Avenue. Cummins had driven his girlfriend, Larena Lee, home. The two of them emerged from the minivan, crossed the street, and proceeded up the driveway to Lee's front door. As they did so, they noticed two men walking on the sidewalk toward Euclid Avenue. Lee noticed one man was wearing "Reeboks and some gray jogging pants" while the other was in dark clothing.
After assuring himself Lee was safely indoors, Cummins returned to his minivan. He looked at the two men once more as he walked. The men were "two houses [further] down towards Euclid" and "[s]ounded like they was (sic) having a little argument." Cummins heard one of them say, "Why you do that sh**?" He also noticed that the taller man "had his hands up" as he faced the shorter man. The taller man was standing on the sidewalk facing his companion and Mount Union Avenue as Cummins drove away.
Lee had been indoors only a short time before she heard the sound of gunshots. The shots apparently were fired close to the house; she could see "light and [she] thought it was lightning outside." Lee heard a series of explosions, a pause, then a final explosion.
The shots also were heard by Ward as he maintained his post at the "drive-thru" window at the Taco Bell restaurant. Ward, too, heard a pause before the final shot was fired. Moreover, the shots were heard by Thomas Mahoney.
Mahoney worked at the Best Steak House Restaurant located opposite the Taco Bell restaurant at the corner of Forest Hills Boulevard and Euclid Avenue. Mahoney had been standing outdoors taking a cigarette break when the sound of the shots drew his attention toward the Taco Bell restaurant. As he turned, he observed "two young gentlemen running towards Euclid on Mount Union." The two paused momentarily, then Mahoney saw the "gentleman who had like a white shirt on, a T-shirt, run back up Mount Union, and the other gentleman who had like a black or navy blue hoody on, dark saggy jeans, cut across [the] Taco Bell parking lot," slow his pace, and proceed "southbound" on Forest Hills Boulevard.
It took nearly forty minutes for the police to arrive at the scene of the shooting. At 11:39 p.m., Officer Brian Gerhard finally received a dispatch to respond to a "male down" call at 1819 Mount Union. He arrived within two minutes to see the victim, Shepard, lying dead in the street. Shepard lay "flat on his back," perpendicular to the sidewalk, with his arms raised and his fists clenched. Gerhard also saw a "small caliber pistol" on the ground near Shepard's right elbow. The arrival of the police prompted Lee to come out of her house to look at the dead man; she recognized him as one of the two men she had seen walking on the sidewalk shortly before the shots were fired. Later, Ward identified the victim as the customer he had seen arguing at the end of the restaurant's driveway.
The subsequent autopsy of the victim revealed he had been shot five times. Four of the bullets had struck Shepard's body from the rear, entering his head on the lower left side, grazing his right shoulder, penetrating his left wrist, and boring into his left arm. The fifth bullet had inflicted the lethal wound; it had entered the center of Shepard's chest from the front and had traveled slightly upward, perforating Shepard's heart and left lung and eventually lodging between Shepard's thoracic vertebrae. The bullets were determined to have been fired from a distance approximately four feet.
During removal of the victim's clothing in preparation for the autopsy, the deputy coroner found a plastic bag hidden in Shepard's underwear. The plastic bag contained numerous pebble-sized objects. Although they appeared to be rocks of crack cocaine, these objects actually were composed of sodium bicarbonate. Testimony at appellant's trial established this chemical ordinarily is used in the process of making crack cocaine, but the rocks in Shepard's possession were made without the addition of the drug; thus, they were imitations.
Subsequent laboratory analysis of Shepard's clothing and the weapon found near his body indicated Shepard kept the gun in the waistband of his pants and had fired the weapon at the attacker through his own jacket prior to his death. Shepard, however, had lived only a few minutes after receiving the wound to his chest.
Late in the evening of May 4, 2000 Victoria Marbley was in the hallway at Park Place Towers, the apartment complex located at 13800 Terrace Road in which she lived, when she saw appellant enter the building. Appellant was a close acquaintance who also lived in one of the apartments. Marbley had purchased drugs from appellant and often acted as a babysitter for appellant's girlfriend's children.
Appellant appeared to be in pain since he was "bent over and he was holding his side." He told Marbley that he was looking for Von Jamison. Marbley had heard appellant refer to Von as his "brother." In answer to Marbley's inquiry as to what had happened, appellant responded that someone had tried to rob him but "[he] shot that M******f***er." Appellant requested Marbley to help him locate Von.
Marbley first aided appellant to the third-floor apartment of Tina Scott, who also was one of appellant's drug customers. When Scott admitted them, Marbley seemed "hysterical" and appellant appeared to be injured. Seeing blood on appellant's hand prompted Scott to dial "911"; however, appellant urged her to replace the receiver. This reaction, together with Marbley's apparently unsuccessful attempt thereafter to use Scott's telephone to reach someone else, caused Scott to tell her visitors to leave.
Having been ejected from Scott's apartment, Marbley aided appellant to the sixth floor of the building. The two then knocked at the apartment door of neighbor Barbara Slymon. Slymon heard Marbley say appellant had been shot; immediately, Slymon pushed them back out into the hallway.
At that point, Marbley convinced appellant to walk with her to the nearest emergency room. At 11:16 p.m., appellant presented himself to the registrant at Meridia Huron Hospital.[2] Appellant told the registrant he had been robbed "[o]n Euclid Avenue, near Taco Bell," and had sustained a gunshot wound. Once inside an examining room, appellant told the nurse he had been "shot with a .22" and had "heard [only] one shot fired." To the emergency room doctor, however, appellant elaborated that he had been "waiting for a bus at a bus stand and some unknown person came and shot him at close range." The doctor treated appellant for a "superficial gunshot wound to his right side," near the abdomen, then, in the early morning hours of May 5, 2000, began the process of admitting appellant to the hospital as a patient for continuing observation.
Pursuant to hospital policy, the police were notified of appellant's injury. Appellant was still in the emergency department examining room when Patrolman Scott Vargo arrived to interview him as the victim of a crime. Vargo asked appellant the location of the shooting. Appellant responded he was "shot next to Taco Bell." At that point, appellant's father entered the room and terminated the interview.
Shortly thereafter, Lt. Jerome Johnson, who had been conducting the investigation of Shepard's death, left the scene of the shooting to proceed to the hospital. Johnson and his officers placed appellant under arrest, performed a gunshot residue test on appellant's hands, and confiscated appellant's clothing. The clothing matched Mahoney's description of what the young man who had fled across the Taco Bell parking lot had been wearing. The gunshot residue test demonstrated appellant recently had fired a weapon he held in his right hand.
Appellant subsequently was indicted on one count of aggravated murder, R.C. 2903.01(A), with a firearm specification. Appellant's case proceeded to a jury trial.
After hearing the testimony of the state's twenty-four witnesses and of appellant and one of his girlfriends, and after viewing over one hundred exhibits, the jury rejected appellant's claim of self-defense and returned a verdict of guilty. The trial court thereupon sentenced appellant to terms of incarceration of three years for the firearm specification to be served prior to life without the possibility of parole for twenty years.
Appellant has filed a timely appeal of his conviction. He presents six assignments of error for review, which will be addressed in logical order and combined when appropriate.
Appellant's second assignment of error states:
 THE TRIAL COURT ERRED BY OVERRULING A DEFENSE OBJECTION TO THE STATE'S USE OF A PEREMPTORY CHALLENGE ON A MINORITY JUROR.
Appellant argues the prosecutors's removal of "Juror Number Seven"[3]
through the use of a peremptory challenge demonstrated purposeful discrimination in contravention of Batson v. Kentucky (1986), 476 U.S. 79; thus, the trial court abused its discretion in overruling appellant's objection to the removal.
Faced with similar facts as those presented in this case, the Ohio Supreme Court has recently set forth the relevant analysis to apply in light of appellant's argument as follows:
 Batson establishes a three-step procedure for evaluating claims of racial discrimination in peremptory strikes. First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination. Id. at 96-98, 106 S.Ct. at 1723-1724, 90 L.Ed.2d at 87-89; Purkett v. Elem (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839; State v. Hernandez (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313-1314. * * * [T]he mere fact that the state challenged only one black prospective juror does not preclude a Batson challenge. See United States v. Battle (C.A.8, 1987), 836 F.2d 1084, 1086.
 The state * * * contends that defendant failed to make a prima facie case of purposeful discrimination. We need not consider this question. At trial, the state gave its reason for challenging [the juror] even though the trial court neither ordered the state to do so nor found that a prima facie case existed. Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. Hernandez v. New York (1991), 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405; State v. Hernandez, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.
 Thus, the Batson analysis moves to the second step: whether the state supplied a race-neutral explanation. * * * The only issue in step two of the Batson analysis is whether the proponent gave a race-neutral explanation for his peremptory challenge. The "explanation need not rise to the level of justifying exercise of a challenge for cause." Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. See, also, Purkett, 514 U.S. at 769, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. While a prospective juror's answers may be sufficient to survive a challenge for cause, both prosecutors and defense attorneys must remain free to challenge on a peremptory basis jurors whose answers create overall concerns on the subject at issue.
 Finally, step three asks whether, in light of all the circumstances, the state did, in fact, have a discriminatory motive for striking the juror. The burden of persuasion always stays with the opponent of the strike. Purkett, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. The trial court's finding is entitled to deference, since it turns largely "on evaluation of credibility." Batson, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21.
State v. White (1999), 85 Ohio St.3d 433, 436-437. (Emphasis in original; underscoring added.)
In this case, the prosecutor justified the removal of Juror Number Seven by stating the juror had little "real life experience," had given "considerably evasive answers" to questions concerning her employment history, and had "responded" in a way that made him doubt the juror had been "completely candid." Thus, the prosecutor indicated Juror Number Seven's answers created, in him, "overall concerns on the subject at issue."
The trial court had observed the juror throughout the voir dire process and accepted the prosecutor's explanation. In view of the lack of any additional facts in the record that would support appellant's claim that the juror's removal was racially motivated, this court must defer to the trial court's findings. Id.; Hicks v. Westinghouse Materials Co. (1997),78 Ohio St.3d 95.
Accordingly, appellant's second assignment of error is overruled.
Appellant's third and fifth assignments of error state:
 III. THE TRIAL COURT ERRED BY ALLOWING A DETECTIVE TO MANUFACTURE A MOTIVE FOR THE STATE.
 V. THE TRIAL COURT ERRED BY ALLOWING PREJUDICIAL OTHER ACTS EVIDENCE TO BE INTRODUCED TO THE JURY.
In these assignments of error, appellant challenges certain evidentiary rulings made by the trial court. It must be noted, however, that the decision whether to admit or to exclude evidence is a matter left within the sound discretion of the trial court and will not be reversed absent a demonstration the trial court abused that discretion. Columbus v. Taylor (1988), 39 Ohio St.3d 162; State v. Sage (1987), 31 Ohio St.3d 173, syllabus 2.
Appellant asserts testimony that he and Von sold drugs to persons who lived in the area where the murder occurred contravened the stricture of Evid.R. 404(B). Appellant further asserts it was unfairly prejudicial to permit Det. Ronald Jones to comment on the significance of the discovery that the victim was carrying "dummy" rocks of crack cocaine at the time of his death. This court concludes, however, the trial court properly allowed this evidence.
Evid.R. 404 states in pertinent part:
(B) Other Crimes, Wrongs or Acts.
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
(Emphasis added.)
With regard to Evid.R. 404(B), the Supreme Court of Ohio has stated the following:
 If the other act does in fact tend to show by substantial proof any of those things enumerated, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, then evidence of the other act may be admissible. (State v. Flonnory [1972], 31 Ohio St. 124, 128, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729, followed.)
State v. Broom (1988), 40 Ohio St.3d 277, syllabus 1. (Emphasis added.) See, also, State v. Lowe (1994), 69 Ohio St.3d 527, 531.
In State v. Matthews (1984), 14 Ohio App.3d 440 at 442, this court observed:
 As the prosecutor argues, proof of motive, intent and plan are proper purposes. To be relevant, * * * and therefore admissible, the other act testimony must [tend] to make the existence of any fact that is of consequence * * * more probable or less probable * * *.
 Evid.R. 401. * * * [I]f the evidence is relevant, it must be excluded [only] if its probative value is substantially outweighed by the danger of unfair prejudice * * *. Evid.R. 403(A). * * * [Citations omitted.]
(Emphasis added.)
 Furthermore, it is well settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony. State v. Jells (1990), 53 Ohio St.3d 22; State v. Stout (1987), 42 Ohio App.3d 38; State v. Norman (1982), 7 Ohio App.3d 17; State v. Morris (1982), 8 Ohio App.3d 12.
In this case, the evidence appellant challenges was highly relevant since it provided both the immediate background and the motive for the killing. State v. Ramjit (Feb. 15, 2001), Cuyahoga App. No. 77337, unreported; see, also, State v. Martin (1985), 19 Ohio St.3d 122.
Both Marbley and Scott were well acquainted with appellant were well aware of his personal and business relationships with Von Jamison. The facts that appellant and Jamison were close, that they were engaged in the sale of drugs in the area of the murder, that the victim was seen arguing with Jamison shortly before the shooting, that the victim carried "dummy" rocks of crack cocaine, and that the sale of such imitation drugs negatively would impact a drugseller's business in an area all tended both to prove appellant's participation in the murder and to negate appellant's claim that he was the target of a random attempted robbery. Hence, since the probative value of the evidence outweighed its prejudicial effect, the trial court did not err in admitting the evidence. State v. Martin (Jan. 27, 2000), Cuyahoga App. No. 73455, unreported.
Accordingly, appellant's third and fifth assignments of error are overruled.
Appellant's fourth assignment of error states:
 PROSECUTORIAL MISCONDUCT DENIED APPELLANT HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR AND IMPARTIAL TRIAL.
Appellant argues improper conduct on the part of the prosecutor during closing argument compromised the fairness of his trial.
The conduct of a prosecuting attorney during a trial generally cannot be made a ground of error unless the conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. State v. Papp (1978), 64 Ohio App.2d 203, cited with approval in State v. Maurer (1984), 15 Ohio St.3d 239. Moreover, it has been held a trial court must afford the prosecutor some latitude and freedom of expression during argument. State v. Apanovich (1987), 33 Ohio St.3d 19; State v. Vrona (1988), 47 Ohio App.3d 145 . Therefore, a defendant shall be entitled to a new trial only when a prosecutor makes improper remarks and those remarks substantially prejudice the defendant. State v. Tibbets (2001), 92 Ohio St.3d 146; State v. Smith (1984), 14 Ohio St.3d 13.
In this case, appellant first takes issue with the prosecutor's statements during the initial portion of closing argument concerning the victim's chest wound. The prosecutor argued the victim "probably" was shot as he lay on the ground with his attacker "standing over him at his feet." A review of the record, however, demonstrates the prosecutor merely was drawing reasonable inferences from the evidence presented. This was within the latitude afforded him as an advocate for the state. State v. Tibbets, supra.
Appellant also asserts during his final address to the jury, the prosecutor improperly denigrated defense counsel's statements and tactics. A review of the challenged remarks indicates they did exceed the bounds of permissible argument. The prosecutor derided defense counsel for having "insulted the entire judicial process of this country," for "twisting the evidence," and for "blatant * * * misrepresenta[tion] * * * in final argument."
 Since a prosecutor may not deliberately vilify his opponent, the remarks were improper. State v. Keenan (1993), 66 Ohio St.3d 402 . However, this court notes defense counsel raised no objection to these remarks. State v. Smith (2000), 87 Ohio St.3d 424, 442. A review of the entire record, moreover, leads to the conclusion that "the few improper statements made by the prosecutor during [final] arguments did not permeate the state's argument so as to deny [appellant] a fair trial." State v. Treesh (2001), 90 Ohio St.3d 460 at 468.
Consequently, appellant's fourth assignment of error is overruled.
Appellant's sixth assignment of error states:
 THE FAILURE TO PROVIDE ACCURATE JURY INSTRUCTIONS DEPRIVED THE APPELLANT OF HIS RIGHT TO A FAIR CONSIDERATION OF THE EVIDENCE IN HIS TRIAL.
Appellant challenges a portion of the trial court's instructions to the jury. Appellant, however, raised no objection to the portion of the charge he now challenges; hence, he has waived his argument with respect to it. State v. Williams (1977), 51 Ohio St.2d 112 . Appellant's sixth assignment of error is overruled.
Appellant's first assignment of error states:
 THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION OF AGGRAVATED MURDER.
Appellant essentially argues his conviction for aggravated murder in violation of R.C. 2903.01(A) must be overturned because the evidence adduced at his trial failed to prove his intent to kill Shepard was formed with the studied analysis required by the statute. This court finds appellant's argument unpersuasive.
The test for sufficiency of the evidence has been stated thusly:
 As to the claim of insufficient evidence, the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.
State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also, State v. Jenks (1991), 61 Ohio St.3d 259, syllabus 2.
R.C. 2903.01, Aggravated Murder, states in pertinent part the following:
 (A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.
The Ohio Supreme Court has repeatedly emphasized the test for prior calculation and design as enunciated in State v. Cotton (1978),56 Ohio St.2d 8, syllabus 3, as follows:
 Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.
(Emphasis added.) See, also, State v. Taylor (1997), 78 Ohio St.3d 15; State v. Claytor (1991), 61 Ohio St.3d 234; State v. Robbins (1979),58 Ohio St.2d 74.
In support of his argument that the killing of Shepard was committed with only "a momentary intent," appellant cites State v. Jenkins(1976),48 Ohio App.2d 99. In Jenkins, the court indicated the following:
 Prior calculation and design sets up a more demanding standard than the old first degree murder standard of "deliberate and premeditated malice." Prior calculation and design requires the accused to have killed purposefully after devising a plan or scheme to kill.
 There must be some kind of studied analysis with its object being the means by which to kill. The kind of momentary deliberation or instantaneous premeditation that was the accepted standard under the old statute, as exemplified by State v. Schaffer (1960), 113 Ohio App. 125, is no longer sufficient or acceptable.
(Emphasis added.)
The Jenkins court then elaborated as follows:
 The trier of fact must look to the context in which the killing occurred to determine whether there was prior calculation and design. Some of the important factors to be examined and considered in deciding whether a homicide was committed with prior calculation and design include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him[;] whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events. These factors must be considered and weighed together and viewed under the totality of all circumstances of the homicide.
(Emphasis added.)
Thus, this court must consider appellant's argument in light of the totality of all the circumstances while viewing the evidence presented in a light most favorable to the prosecution.
The inferences to be drawn from the evidence adduced at appellant's trial are the following: (1) appellant and his partner Von Jamison were drug dealers in business in the area where the Taco Bell restaurant was located; (2) Shepard, who was carrying a quantity of "dummy" rocks of crack cocaine, constituted a threat to their more "legitimate" business; (3) despite a warning issued to him by Jamison, Shepard was defiant; (4) shortly thereafter, Shepard was seen in appellant's company with his hands raised; (5) appellant fired a weapon at Shepard, shooting and striking him four times as he tried to escape; (6) although Shepard fell to the ground with four separate wounds in his head and arms, he managed to shoot appellant once in the abdomen; and (7) during a pause in the struggle, as Shepard lay comparatively helpless, appellant stood over him and fired one last shot into his chest.
A review of the evidence thus reveals ample circumstantial evidence such that reasonable minds could reach different conclusions as to whether each material element of the crime of aggravated murder was proven beyond a reasonable doubt. State v. Taylor, supra; State v. Fears (1999), 86 Ohio St.3d 329.
It is within the jury's province to choose between competing constructions of the evidence; therefore, the trial court did not err in overruling appellant's motions for acquittal. State v. Jenks, supra.
Accordingly, appellant's first assignment of error is over-ruled.
Appellant's seventh assignment of error states:
THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE.
Appellant argues that, based upon the totality of the evidence, no reasonable jury could have discounted his claim of self-defense and found him guilty of the offense charged. His argument is not persuasive.
In State v. Martin, supra, at 175, the court set forth the test to be utilized when addressing the issue of manifest weight of the evidence:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
(Emphasis added.) See, also, State v. Thompkins (1997), 78 Ohio St.3d 380.
A reviewing court will not reverse a verdict where there is substantial evidence upon which the trier of fact could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169; State v. Jenks, supra. Moreover, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
A review of the record in this case demonstrates the testimony of the state's witnesses created a logical, coherent scenario that was corroborated by the coroner's report, trace evidence findings, physical evidence recovered, and telephone records.
Appellant's theory of self-defense, on the other hand, was undermined by the placement of Shepard's wounds, by appellant's own failure to give a uniform account of the incident, and by appellant's testimony on cross-examination.
In short, consistent and credible evidence supported the jury's conclusion that appellant set out to kill Shepard for his temerity after he defied Jamison. Despite the victim's attempt to flee, and despite being wounded himself, appellant remained long enough to complete his mission. The jury's verdict, therefore, fails to indicate a manifest miscarriage of justice occurred. State v. Ramjit, supra; State v. Jenkins (Feb. 10, 2000), Cuyahoga App. No. 75343, unreported; State v. McClain (Jan. 14, 1993), Cuyahoga App. No. 61541, unreported.
Accordingly, appellant s seventh assignment of error also is overruled.
Appellant's conviction is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J. and JAMES J. SWEENEY, J. CONCUR
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] This hospital is located between Park Place Towers and the Taco Bell restaurant, which indicates appellant passed it in order to search for Jamison at the apartment building after receiving the abdominal wound.
[3] In order to protect her privacy, this juror will not be referred to by name in this Opinion.